In re APF CO., et al., Debtors.

No. 98–1596(PJW).

United States Bankruptcy Court,
D. Delaware.

Feb. 5, 2001.

Brendan Linehan Shannon, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Robert E. Richards, Sonnenschein, Nath & Rosenthal, Chicago, IL, for Claimants.

Gregg M. Galardi, Van C. Durrer, II, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, DE, J. Eric Ivester, J.

Gregory St. Clair, Skadden, Arps, Slate, Meagher & Flom (Illinois), Chicago, IL, for the FPA Plan Administrator.

## MEMORANDUM OPINION

PETER J. WALSH, Chief Judge.

Before the Court is the request (Doc. # 2355) of Dr. John G. Keene ("Keene"), Dr. Robert W. Strauss ("Strauss"), and Mr. Marc V. Weiner ("Weiner") (collectively, the "Claimants") for approximately $1 million of "Additional Consideration" as an administrative expense. The Additional Consideration request arises from two agreements governing Claimants' prepetition sale of their business to FPA Medical Management, Inc. ("FPA"), now known as APF Co., Inc. ("APF"). Claimants characterize the Additional Consideration as incentive compensation for services they rendered postpetition. For the reasons discussed below, I will deny the request. I find that the Additional Consideration is a deferred payment arrangement for FPA's prepetition acquisition of Claimants' business and accordingly gives rise to a prepetition claim.

## BACKGROUND

Keene, Strauss and Weiner owned and operated Emergency Treatment Associates, Inc. ("ETA"). ETA provided outsourced emergency room management services for hospitals. To administer the relationship with the hospitals, Keene and Strauss formed a professional corporation ("PC") for each hospital with which they worked. Each PC in turn entered into a contract with ETA under which ETA performed a variety of administrative services for the PCs. Keene and Strauss were the sole shareholders, directors and officers of the PCs. Weiner joined ETA in 1996.

In February 1998, Keene, Strauss and Weiner sold ETA to FPA and its affiliate, Sterling Healthcare Group ("Sterling"). At that time, FPA was a nationwide physician practice management company. Pursuant to the terms of the sale, ETA became Sterling ETA ("SETA"), an entity indirectly owned by FPA. The terms of the merger and sale are set forth in the Agreement and Plan of Merger, dated February 17, 1998 by and among FPA Medical Management, Inc., ETA Acquisition Corp., Emergency Treatment Associates, Inc. and John G. Keene, M.D., Robert W. Strauss, M.D., and Marc V. Weiner ("Merger Agreement").[1] Doc. # 2208, Exh. C. In consideration for the sale of ETA to FPA, Claimants received (1) cash, (2) shares of FPA common stock and (3) the Additional Consideration as set forth in Schedule 2.01. Merger Agreement at 3, Article II, § 2.01(c).

As a condition of the Merger Agreement, SETA entered into contracts with the PCs to provide the administrative services previously provided by ETA ("Administrative Services Agreement"). SETA also entered into three year employment agreements with Strauss, Keene and Weiner ("Employment Agreements") under which each received, *inter alia,* a base annual salary of $126,500. Doc. # 2208,

---

1. The parties submitted the relevant contracts into evidence during a previous hearing. *See* Transcript of Proceedings, Wednesday, June 16, 1999, *In re FPA Medical Mgmt.,* Ch. 11 Case No. 98–1596(PJW) (Bankr.D.Del.) (Doc. # 2265) at 37, 40, 43; Debtors' Memorandum of Law in Support of Objection to Claim for Payment of Incentive Compensation...of...Keene...Strauss and...Weiner ("Debtors' Memorandum of Law") (Doc. # 3569) at 9 n. 7. The agreements are attached as exhibits to the Declaration of Robert W. Strauss, M.D., in Support of Objection of Poughkeepsie Related Parties to Proposed Assumption and Assignment of Various Executory Contracts. Doc. # 2208, Exhs. A, B and C. The parties do not dispute their authenticity.

Exh. A. SETA employed Strauss and Keene as Regional Medical Directors and Weiner as its Regional Vice President. Apart from minor differences not relevant here, the Employment Agreements are identical.

Several months after the consummation of the ETA sale, commencing July 19, 1998, FPA and its affiliates, including SETA (collectively, the "Debtors"), filed voluntary petitions for chapter 11 relief. During the chapter 11 proceedings, the Debtors proposed to sell substantially all of their operations to Coastal Physician Group, Inc. ("Coastal"). As part of the sale to Coastal, Debtors intended to assume and assign the Administrative Services Agreement and the three Employment Agreements but had intended to reject the Merger Agreement. Strauss, Keene and Weiner objected.

On June 14 and 16, 1999, I held a hearing on the assumption and assignment of the disputed contracts. I ruled that the Employment Agreements and the Merger Agreement were so integrated that an assumption of the Employment Agreement could not be affected absent an assumption of the Merger Agreement under § 365(a). *See* Transcript of Proceedings, Wednesday, June 16, 1999, *In re FPA Medical Mgmt.*, Ch. 11 Case No. 98–1596(PJW) (Bankr.D.Del.1999) ("June 1999 Hearing Transcript") (Doc. # 2265) at 24; Order on Objection of Poughkeepsie Related Parties to the Debtors' Assumption and Assignment of Certain Executory Contracts to the Purchaser under 11 U.S.C. § 365 ("Or-

der on Executory Contracts") (Doc. # 2815) at 2, ¶ 2. I did not rule on any of the remaining issues under either the Merger Agreement or the Employment Agreements.[2] Order on Executory Contracts at 2–3, ¶ 2.

I did, however, authorize the Debtors to assume and assign the Administrative Services Agreements. June 1999 Hearing Transcript at 218; Order on Executory Contracts at 3, ¶ 3. As a result, Debtors rejected the Employment Agreements and the Merger Agreement. Order on Executory Contracts at 2–3, ¶ 2. Under the Debtors' confirmed chapter 11 plan, rejection of the Employment Agreements and the Merger Agreement was effective as of July 8, 1999, the effective date of the plan. Strauss, Keene and Weiner worked until this time and apparently received the base salaries in their Employment Agreements.

Strauss, Keene and Weiner each filed a proof of claim in Debtors' bankruptcy based on their Employment Agreements and the Merger Agreement. On July 23, 1999, Claimants filed the present request for "incentive compensation" as an administrative expense premised on Schedule 2.01 of the Merger Agreement. According to Claimants, Schedule 2.01 is additional consideration in the nature of a performance-based employment compensation which they bargained for as part of the ETA sale. They state the Schedule 2.01 benefits were intended to offset their assent to a lower annual salary in their Employment Agreements. They maintain that Schedule 2.01 reflects "an agreement

**2.** Accordingly, I disagree with Claimants' characterization of my ruling as a finding that the "incentive compensation schedule was an integrated part of the consideration for the services of Keene, Strauss and Weiner under their respective employment agreements." Claimants' Memorandum of Law at 2. As my Order on Executory Contracts makes clear, I expressly limited my ruling on the subject of

the Merger Agreement and the Employment Agreement to their integration for purposes of assignability under § 365. I made no related findings on their substance or the effect of integration on the terms of the contracts themselves. For this same reason, I also reject Claimants' implication that Debtors are seeking to collaterally attack my June 16, 1999 ruling.

to pay to Keene, Strauss and Weiner incentive compensation based on an EBITDA[3] formula. The EBITDA formula reflected negotiated and mutually agreed earning targets which the Claimants would seek to achieve through their going forward services." Claim for Payment of Incentive Compensation as Administrative Expense and Substantial Contribution ("Administrative Expense Claim") (Doc. # 2355) at 2, ¶ 2.

Claimants insist they worked for SETA in reliance on the possibility of earning the "incentive compensation" and that they reached the EBITDA targets set forth in Schedule 2.01. Memorandum of Law of Dr. John G. Keene, Dr. Robert W. Strauss, and Mr. Marc V. Weiner ("Claimants' Memorandum of Law") (Doc. # 3621) at 2, ¶ 2. Claimants state they not only expanded the businesses of the PCs, but also generated a new hospital contract and played a leading role in collecting more than $11 million in Medicare receivables, all for the benefit of the Debtors. *Id.* at 3–4.

In response, Debtors argue that Schedule 2.01 is neither salary nor an employment bonus.[4] Rather, Debtors say it is simply a deferred installment of the purchase price FPA paid Claimants for ETA. Accordingly, Debtors maintain Claimants have no more than a prepetition claim against Debtors' bankruptcy estate. Debtors' Memorandum of Law at 2.

Alternatively, Debtors argue that even if Claimants have some form of administrative claim for consideration still due under the Merger Agreement, Claimants' request is unreasonable and should be disallowed or reduced. *Id.* at 2–3. Debtors state they already compensated Claimants for postpetition services by paying salaries that Debtors maintain exceed compensation to other employees for similar services. Debtors also emphasize that Claimants received $5.5 million prepetition in consideration for their sale of ETA to FPA and that additional compensation is unreasonable, especially given that the amount requested exceeds SETA's entire annual earnings. *Id.* Finally, Debtors argue that the claims should be equitably subordinated under § 510(c)[5] or denied outright under § 502(d) based on Claimants' alleged postpetition malfeasance and misappropriation of Debtors' funds.

### DISCUSSION

This dispute hinges on construction of Schedule 2.01 of the Merger Agreement. If Schedule 2.01 is essentially a bonus provision earned postpetition, as Claimants assert, then they have a strong argument that their claim is entitled to administrative expense priority. Under § 503(b)(1)(A) administrative expenses include "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for ser-

**3.** Schedule 2.01 defines EBITDA as "earnings, before interest, depreciation, amortization and taxes." Doc. # 2208, Exh. C at Schedule 2.01–1.

**4.** Debtors submitted a memorandum of law in support of their objection to Claimants' request. Doc. # 3569. Debtors submit the same document in support of the complaint in their adversary proceeding against Strauss, Keene and Weiner. *See APF Co. and Sterling Emergency Treatment Assoc. v. Keene (In re APF Co.),* Ch. 11 Case No. 98–1596, Adv. No.

00–413 (Bankr.D.Del.). Debtors' complaint alleges willful and intentional violations of the automatic stay; conversion of estate property; breach of fiduciary duty; and unjust enrichment. The complaint also seeks a declaratory judgment disallowing Claimants' administrative expense claim or subordinating the request under 11 U.S.C. § 510(c).

**5.** Unless otherwise indicated, all references to "§ ___" are to a section of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

vices rendered after the commencement of the case." [6] 11 U.S.C. § 503(b)(1)(A); *In re Roth American, Inc.,* 975 F.2d 949, 958 (3d Cir.1992) (vacation and severance pay entitled to administrative expense priority to extent benefits were earned by services rendered postpetition); *accord Isaac v. Temex Energy, Inc. (In re Amarex, Inc.),* 853 F.2d 1526, 1531–32 (10th Cir.1988) (bonus due under employment agreement entitled to administrative priority to the extent earned postpetition).

■ On the other hand, if Schedule 2.01 of the Merger Agreement is deferred consideration for FPA's prepetition acquisition of Claimants' business, then the obligation is a prepetition claim even if payment came due postpetition. The fact that payments under a contract come due after the bankruptcy filing does not alter the conclusion that the payments are prepetition obligations. *Stewart Foods, Inc. v. Broecker (In re Stewart Foods, Inc.),* 64 F.3d 141, 146 (4th Cir.1995); *Chiasson v. J. Louis Matherne & Assoc. (In re Oxford Mgmt.),* 4 F.3d 1329, 1335 n. 7 (5th Cir.1993) ("A claim is not rendered a post-petition claim simply by the fact that time for payment is triggered by an event that happens after the filing of the petition"); *United States v. Gerth,* 991 F.2d 1428, 1433 (8th Cir.1993) ("[D]ependency on a postpetition event does not prevent a debt from arising prepetition").

■ Principles of contract interpretation govern the construction of the relevant documents. Neither party argues that the Additional Consideration provisions of the contracts are ambiguous. Where the contracts are unambiguous, discerning contractual intent presents a question of law. *In re Barclay Indus.,* 736 F.2d 75, 78 n. 3 (3d Cir.1984) *quoting*

*Landtect Corp. v. State Mut. Life Assurance Co.,* 605 F.2d 75, 79 (3d Cir.1979).

■ The Merger Agreement unambiguously sets forth the three elements FPA paid as consideration for ETA's stock: (1) cash; (2) FPA stock; and (3) "Additional Consideration" as spelled out in Schedule 2.01.

(c) *Merger Consideration for Company [ETA] Common Stock.* FPA shall deliver to the Selling Shareholders *in consideration for all the issued and outstanding shares* of Company [ETA] Common Stock (i) cash in the amount of Two Million Five Hundred Sixty Thousand Dollars ($2,560,000); (ii) a number of shares of the common stock ... of FPA ... equal to Two Million Five Hundred Sixty Thousand Dollars ($2,560,000) [based on a formula]...; and (iii) *a certain Additional Consideration, if any, payable upon the terms and conditions set forth in Schedule 2.01....* Subparagraphs (i), (ii) and (iii) are referred to collectively herein as the "Merger Consideration" and subparagraphs (i) and (ii) are referred to collectively herein as the "Initial Merger Consideration."

Merger Agreement, Article II, § 2.01(c) at 3(emphasis added).

Schedule 2.01 provides:

If the Surviving Corporation achieves, during each of the first, second and third twelve month periods following the Closing Date (each a "Measurement Period"), the targeted earnings, before depreciation, interest, amortization and taxes (the "Targeted EBIDTA") for such Measurement Period as set forth herein, the Selling Shareholders and the Optionholder shall have the right to receive from FPA additional consideration in the aggregate amount of Two Million

---

**6.** Section 507(a)(1) affords first priority to "administrative expenses allowed under section 503(b) of this title..." 11 U.S.C. § 507(a)(1).

Nine Hundred Dollars ($2,900,000) (the "Additional Consideration")(allocated in accordance with Schedule 7.03(j) attached hereto).[7]

. . .

In any Measurement Period in which Additional Consideration is earned, FPA shall pay such Additional Payment no later than twenty (20) business days after the delivery of the Final Income Statement for such Measurement Period. The payment of each Additional Payment, if any, shall be comprised of 50% shares of FPA Common Stock and 50% cash.

Merger Agreement, Sch. 2 at 2.01–1—2.01–2.

These provisions establish that Claimants sold ETA for $8.02 million as follows: an initial consideration of $5.12 million payable in cash and FPA stock, and additional consideration of $2.9 million payable over three years if the business performed at the targeted EBITDA level.

Schedule 2.01 strikes me as a standard variation of an earnout agreement.[8] By its terms, it sets forth *additional consideration* for FPA's purchase of ETA. It is an installment of the purchase price, payment of which is conditioned on the future profitability of the business. If the buyer goes into bankruptcy as it did here, the consideration not received up front becomes part of the sellers' prepetition claim for damages. I have seen any number of situations where a prepetition seller's earnout entitlements are adversely impacted by the buyer's bankruptcy.

By way of analogy, the situation in which Claimants find themselves is similar to one in which a seller in a prepetition merger takes a promissory note payable over time. If the buyer files bankruptcy before expiration of the note's term, the remaining installment payments become a prepetition claim even if the installment payments come due postpetition. "The character of a claim is not transformed from prepetition to postpetition simply because it is contingent, unliquidated or unmatured when the debtor's petition is filed." *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1036 (5th Cir. 1987) *quoting with approval In re Morristown Lincoln–Mercury, Inc.*, 42 B.R. 413, 418 (Bankr.E.D.Tenn.1984). The fact that Claimants' contracts were executory does not change this result. Under § 365(g), Debtors' rejection of an executory contract is deemed a prepetition breach and gives rise to a prepetition claim.

My finding that Schedule 2.01 is deferred payment of ETA's purchase price is supported by the fact that the targeted EBITDA remains essentially unchanged over the three year period and that the Additional Consideration is fixed at $2.9 million. This is consistent with an earnout provision, under which payment of the final purchase price of a business is contingent on the business maintaining targeted earnings after the sale. It is inconsistent, however, with an incentive earning arrangement that rewards an employee in proportion to the employee's performance or profit achieved.

To illustrate, SETA had to realize an EBITDA of $1,012,000 during the first

---

7. Schedule 7.03(j) allocates distribution of the Additional Consideration between Strauss, Keene and Weiner.

8. An earnout agreement is one for the sale of a business whereby the buyer first pays an agreed amount up front and leaves the final purchase price to be determined by the future profits of the business. Usually, the seller helps manage the business for a period after the sale. BLACK'S LAW DICTIONARY 526 (7th ed.1999).

Measurement Period for Claimants to receive Additional Consideration of $966,667. Merger Agreement, Schedule 2.01. SETA had to realize an EBITDA of $1,164,000 during the second Measurement Period for Claimants to receive the second installment of Additional Consideration of $966,667. *Id.* Thus, as Debtors point out, "for generating $284,000 in increased earnings over two years (or, double-counting the first year increase in profitability the second year, $416,000), the [Claimants] would in return receive over $1.9 million from SETA." Debtors' Memorandum of Law at 7. Conversely, had the Claimants generated $ 10 million in increased earnings over two years, they still would have been entitled to only approximately $1.9 million. Thus, contrary to what one would expect from an "incentive compensation" provision, there is no apparent relationship between the level of Claimants' performance and the Additional Consideration to which they become entitled in Schedule 2.01.

Claimants' reliance on my prior ruling that the Merger Agreement and Employment Agreements are integrated for purposes of § 365(a) does not aid their position. The integration of the two agreements does not transform the Additional Consideration into wages or "incentive compensation" any more than it alters the other two forms of consideration Claimants received for the sale of ETA to FPA. In fact, at the June 19, 1999 hearing, I indicated that the earnout provision in the Merger Agreement might not be paid if the Employment Agreement is rejected. June 19, 1999 Hearing Transcript, p. 220.

9. The Employment Agreements define "Term" as:
    *Term.* This Agreement shall continue in full force and effect for a term of three (3) years

But the clearest indication that Schedule 2.01 is deferred payment of ETA's purchase price is that the Employment Agreement itself does not treat the Additional Consideration as compensation. The compensation clause of the Employment Agreement nowhere mentions, incorporates or refers to the Additional Consideration. It simply provides:

3. *Compensation.* For services rendered pursuant to this Agreement, Employee shall receive, commencing on the Effective Date a base salary of One Hundred Twenty-six Thousand Five Hundred Dollars ($126,500) per year payable in accordance with the pay period policy established by the Company from time to time.

Employment Agreement, § 3 at 1, Doc. # 2208, Exh. A.

Nor does any other provision of the Employment Agreement incorporate the Additional Consideration. The only reference to Schedule 2.01 in the Employment Agreement is in its termination provisions which provide in pertinent part:

(b) Termination by the Company ... in the event of Employee's disability.... If the Company terminates Employee's employment for Disability, Employee shall receive the compensation due and payable under Section 3 of this Agreement ...; provided, however, that Employee shall also be entitled to his share of Additional Consideration, as defined in Schedules 2.01 and 7.03(j) of the Merger Agreement, during the balance of the Term.[9]

(c) Employee's Death. In the event of Employee's death, the Company will have no further obligation under this Agreement as of the date of termination

beginning on the Effective Date [February 17, 1998], unless sooner terminated pursuant to Section 6 below (the "Term").

other than compensation due and payable under Section 3 of this Agreement ...; provided, however, that Employee shall also be entitled to his share of Additional Consideration, as defined in Schedules 2.01 and 7.03(j) of the Merger Agreement, during the balance of the Term, which amounts shall be paid to his estate.

(d) Termination by the Company for any other reason, including (but not limited to) the insolvency, non-renewal of the Term by the Company, bankruptcy, dissolution or liquidation of the Company. Upon such termination, Employee shall receive: ... (iii) within 14 days of termination, a lump sum payment equivalent to his share of Additional Consideration, as defined in Schedules 2.01 and 7.03(j) of the Merger Agreement, accelerated for the balance of the Term, such Additional Consideration to be calculated *using the assumption that the Targeted EBITDA (as defined in the Merger Agreement) is met for the current and, if applicable, future twelve month period(s) of the Term.*

(e) Termination by Employee upon default by the Company of any of the terms of this Agreement; .... Upon such termination, Employee shall receive: ... (iii) within 14 days of the date of termination, a lump sum payment equivalent to his share of the Additional Consideration, as defined in Schedules 2.01 and 7.03(j) of the Merger Agreement, accelerated for the balance of the Term, to be calculated *using the assumption that the Targeted EBITDA is met for the current and, if applicable, future twelve month period(s) of the Term.*

Employment Agreement, §§ 6(b)-(e), Doc. # 2208, Exh. A (Weiner's Employment Agreement) at 3–4 (emphasis added).

These provisions entitled each of the Claimants to the *full* Additional Consideration in Schedule 2.01 for the remainder of the three year employment term even if their employment had been terminated immediately following commencement of their employment, for any of the four reasons specified. Thus, the Additional Consideration clearly bears no relationship to Claimants' continuing work effort. This is apparent both from the payment of Additional Consideration in the event of the employee's disability or death, and by the accelerated payment based on the *assumption* that the targeted EBITDA is reached for all remaining measurement periods in the event of termination by SETA. Thus, if one of the Claimants were terminated under subsection (d) or (e) a day after his employment commenced, he would be entitled to the accelerated amount (three times $393,333.50 for Strauss and Keene and $180,000 for Weiner per Schedule 7.03(j)) of Additional Consideration regardless of what the EBITDA is for any of those three periods.

The effect of the reference to Schedule 2.01 in the Employment Agreements is simply to protect Claimants' right to future payment for the sale of their business under the Merger Agreement. It preserves the benefit of Claimants' bargain under the Merger Agreement in case of early termination, disability or death. The Employment Agreement does not of itself establish an obligation to pay Additional Consideration, either as a performance bonus or "incentive compensation."

I do not give much weight to Claimants' argument that their postpetition performance for the Debtors was solely in reliance on the Additional Consideration and should be accorded administrative treatment as substantial contribution. The services Claimants rendered are consistent with their duties as executive level employ-

ees, for which the Debtors compensated Claimants at an annual salary of $126,500. Had the parties intended to include a bonus incentive for employment, it seems to me they would have included such a provision in the compensation section of the Employment Agreement, rather than making the alleged "incentive compensation" payable on the employee's disability, death or termination.

Finally, the fact that Claimants chose to accept less salary in exchange for more merger consideration does not alter the legal nature of Debtors' obligations under the agreements. Although in hindsight Claimants may have chosen differently, Schedule 2.01 remains part of the purchase price FPA paid prepetition when it bought Claimants' business. It is not compensation for services rendered. As such, it gives rise to a prepetition claim.

## CONCLUSION

For the reasons stated above, I deny Claimants' request for payment of the Additional Consideration in Schedule 2.01 of the Merger Agreement as an administrative expense. Schedule 2.01 is not "incentive compensation." The unambiguous terms of the Merger Agreement establish that Schedule 2.01 is deferred consideration for Debtors' prepetition acquisition of ETA and accordingly gives rise to a prepetition claim.