NO. 07-08-0057-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

JANUARY 27, 2010

_____

IN THE MATTER OF THE MARRIAGE OF
WILLIAM HERBERT WATSON AND NINA JOYCE WATSON
_____

FROM THE 99TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2006-533,951; HONORABLE WILLIAM SOWDER, JUDGE
_____

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

**MEMORANDUM OPINION**

In this appeal of a property dispute arising in a suit for divorce, appellant Nina Watson contends the trial court mischaracterized as the separate property of her husband, appellee William Herbert Watson, Jr. (Billy), shares of stock he received during marriage from his father and funds he received under an "earnout agreement" on the sale of the family business. Finding the trial court did not abuse its discretion in its characterization of the property in question, we will affirm.

## Background

Billy's father, William Herbert Watson, Sr. (W.H.) founded Watson Institutional Foods, Inc. ("Watson Foods") in 1955 and was CEO. Mike Davis and later Billy worked for Watson Foods while attending college and after graduation became full-time employees. Each rose in responsibility. Davis ultimately became president and chief operating officer. Billy became executive vice president of sales and marketing.

In 1985, W.H. began to transfer shares of stock in the corporation to Billy and Davis. From 1985 through 1999, W.H. annually transferred equal amounts of his Class A, or voting, shares of the corporation to Billy and Davis. Through these transfers, each eventually obtained 12.25 percent Class A share ownership.[1] According to W.H.'s trial testimony, the stock transfers to Davis and the Watson children were gifts made according to an estate plan.

During the tenure of Billy and Davis, Watson Foods grew significantly. Davis testified it more than doubled. Billy and Davis handled the day-to-day operations but W.H. retained controlling share ownership and an active presence in the business. By the 1990s, other entities expressed interest in purchasing the corporation. In early 2000, a deal was struck whereby Watson Foods merged with Sysco Food Services of Texas, Inc. (Sysco Texas) a wholly-owned subsidiary of Sysco Corporation. Sysco Texas was the surviving corporation of the merger.

---

[1] W.H.'s other two children, who were not employees of Watson Foods, received Class C shares.

According to Davis, the consideration Sysco paid for the merger was allocated among an exchange of stock, replacement of the corporation's employee stock ownership plan with a Sysco 401(k) plan, a noncompetition agreement paying cash to Billy, Davis, and W.H., and an earnout agreement. Entitlement to payment under the earnout agreement required that Sysco Texas achieve agreed "performance goals" over the three years following the merger.

Billy and Nina married in June 1995 and in February 2006 Billy filed for divorce. Nina counterclaimed seeking a disproportionate division of the community estate. The major issues for trial were property characterization and division. Following a bench trial, the court granted the divorce and divided the marital estate. On the request of Nina, it made findings of fact and conclusions of law. Among other things, it classified as Billy's separate property the Sysco stock derived from the Watson Foods shares he received from W.H., before and during marriage, and the principal balance of funds paid Billy under the earnout agreement with Sysco.

Analysis

Through her first two issues Nina contends the trial court mischaracterized as Billy's separate property the Watson Foods stock he acquired from his father and the proceeds paid under the earnout agreement.

To determine whether the trial court erred in characterizing property, we apply an abuse of discretion standard. *See Boyd v. Boyd*, 131 S.W.3d 605, 617 (Tex.App.–Fort Worth 2004, no pet.). A trial court abuses its discretion when it acts without reference to any guiding rules or principles or, said differently, the act under review was arbitrary and

unreasonable. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex. 1985). Under the abuse of discretion standard, applied in a family law case, legal and factual sufficiency of the evidence are not independent grounds of error, but are relevant factors for determining whether the trial court abused its discretion. *Boyd*, 131 S.W.3d at 611; *Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex.App.–Dallas 2005, pet. denied). *See Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991) (turnover order). Only if the trial court's mischaracterization is of such proportion that it affects the just and right division of the community estate must we remand the entire case for a just and right division based on the correct characterization of the property. *Boyd*, 131 S.W.3d at 618.

Community property is property, other than separate property, acquired by either spouse during marriage. *See* Tex. Fam. Code Ann. § 3.002 (Vernon 2006). Separate property is property owned by a spouse before marriage, acquired during marriage by gift, devise, or descent, or acquired as a recovery for personal injuries sustained during the marriage. *See* Tex. Fam. Code Ann. § 3.001 (Vernon 2006). Property possessed by either spouse during or on dissolution of marriage is presumed community property. Tex. Fam. Code Ann. § 3.003(a) (Vernon 2006); *Roach v. Roach*, 672 S.W.2d 524, 529 (Tex.App.–Amarillo 1984, no writ). To overcome the presumption of community property, the contesting spouse must prove by clear and convincing evidence that the property is separate. Tex. Fam. Code Ann. § 3.003(b) (Vernon 2006). "Clear and convincing evidence" is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

4

A gift is a voluntary transfer of property to another made gratuitously and without consideration. *Hilley v. Hilley*, 161 Tex. 569, 342 S.W.2d 565, 569 (1961). The elements of a gift are: (1) the intent to make a gift; (2) delivery of the property; and (3) acceptance of the property. *Panhandle Baptist Found., Inc. v. Clodfelter*, 54 S.W.3d 66, 72 (Tex.App.–Amarillo 2001, no pet.).

In reviewing the legal sufficiency of the evidence under a clear and convincing standard, we look at all the evidence, in the light most favorable to the judgment, to determine if the trier of fact could reasonably have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 265-66. We presume that the trier of fact resolved disputed facts in favor of its findings if a reasonable trier of fact could do so. *Id.* We disregard any contrary evidence if a reasonable trier of fact could do so, but we do not disregard undisputed facts. *In the Interest of J.L.*, 163 S.W.3d 79, 85 (Tex. 2005).

In conducting a factual sufficiency review under the clear and convincing standard, we must consider all the evidence the fact finder could reasonably have found to be clear and convincing, determining whether, on the entire record, the fact finder could reasonably have formed a firm belief or conviction of the truth of the allegations. *See In re J.F.C.*, 96 S.W.3d at 266; *In the Interest of C.H.*, 89 S.W.3d 17, 25, 27-29 (Tex. 2002). In so doing, we consider whether disputed evidence is such that a reasonable fact finder could have resolved it in favor of its finding. If, in light of the entire record, disputed evidence that a reasonable fact finder could not have resolved in favor of the finding is so significant as to prevent a fact finder reasonably from forming a firm belief or conviction of the truth of the finding, then the evidence is factually

5

insufficient.  *See In re J.F.C.*, 96 S.W.3d at 266; *In re S.M.L.D.*, 150 S.W.3d 754, 757 (Tex.App.–Amarillo 2004, no pet.).

The Stock

We turn first to the characterization of the Watson Foods stock that Billy received from W.H.  The evidence included transfer documents which, according to testimony, reflected the 1995 through 1999 transfers of Watson Foods stock from W.H. to Billy, during Billy's marriage to Nina and prior to the merger.  Except for their dates and the details of the shares transferred, the transfer documents are identical in form.  The document is entitled, "Act of Donation Inter Vivos."  A sub-heading follows, stating, "Act of Donation Inter Vivos By William H. Watson To William H. Watson, Jr."  In part, material to our discussion, the document continues:

> WILLIAM H. WATSON, of full legal age and resident of LUBBOCK, State of TEXAS who declared under oath to me, Notary, that in consideration of the relationship and services provided, do by these presents grant, bargain, donate, convey, transfer, assign, set over, abandon and deliver, . . . unto the said WILLIAM H. WATSON, JR., of full legal age and resident of LUBBOCK, State of TEXAS, here present and accepts such donation with gratitude as his/her separate property and estate for himself, his heirs and assigns, and acknowledging due delivery and possession thereof, all and singular the following property to-wit:
>
> An entire interest in the following described property:
>
>> [here appears the number, class, and value of shares transferred] as of the date of this gift, as determined by an independent appraiser.
>>                                                 ***
>
> TO HAVE AND TO HOLD the above-described property unto the said donee . . . forever.

> THUS DONE AND PASSED, in my presence, WILLIAM H. WATSON, Donor and WILLIAM H. WATSON, JR., Donee [date], in the presence of . . ., competent witnesses, who hereunder sign their names with the said appearers and me, Notary, after reading of the whole.

Each transfer document is signed by W.H., Billy, two witnesses and the notary public.

Simply said, Nina contends the transfer document's inclusion of the phrase "in consideration of the relationship and services provided" provides conclusive evidence the shares were transferred in consideration of Billy's services during the marriage, requiring their characterization as community property. Billy counters that the language of the transfer document evidences a gratuitous transfer rendering the shares his separate property. Neither party claims ambiguity in the transfer document. Thus, its construction is a matter of law that we review *de novo*. *See Borders v. KRLB, Inc.*, 727 S.W.2d 357, 359 (Tex.App.–Amarillo 1987, writ ref'd n.r.e.). As such, we need not defer to any interpretation afforded the document by the trial court. *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex.App.–Amarillo 2000, no pet.). We strive to give effect to the intent of the parties as taken from the language of the instrument, and we consider the language in its entirety. *Id.* Specifically, we peruse the entire document to understand, harmonize, and effectuate all of its provisions. *Id.*; *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995) (contract is read as a whole, rather than by isolating a certain phrase, sentence, or section).

We cannot agree the phrase "in consideration of the relationship and services provided," in the transfer document has the effect Nina posits. Excepting only the two words "services provided," the transfer document in all respects speaks of a gift transfer. Its title and sub-heading refer to a donation; its parties are referred to as donor

7

and donee; by its acceptance language the donee "accepts such donation with gratitude as his/her separate property and estate." The four corners of the instrument give no hint of the nature of the "services provided."[2] Nina's argument assumes the phrase can mean only a valuable consideration, and her assumption likely would be accurate in most instances. But, like the "relationship" recited as constituting part of the consideration for these share transfers, consideration recited in a document of transfer may refer to a non-valuable consideration that is not inconsistent with a gift. *See, e.g., Babb v. McGee*, 507 S.W.2d 821, 823 (Tex.Civ.App.–Dallas 1974, writ ref'd n.r.e.) (recitation in deed of $10.00 and love and affections held to constitute a gift); *cf. Glenney v. Crain*, 352 S.W.2d 773, 775 (Tex.Civ.App.–Houston 1961, writ ref'd n.r.e.) (love and affection is not a consideration deemed valuable in law). Attempting to reconcile and harmonize all of the language employed in the transfer document, we seek guidance in a phrase recently employed by the Texas Supreme Court, *noscitur a sociis* ("a word is known by the company it keeps"). *United States Fid. & Guar. Co. v. Goudeau*, 272 S.W.3d 603, 606 (Tex. 2008) (construing insurance policy). By this canon of construction, the meaning of a particular word or phrase is ascertained by reference to those words or phrases with which it is associated. *See Green Ave. Apartments Inc., v. Chambers*, 239 S.W.2d 675, 684-85 (Tex.Civ.App.–Beaumont 1951, no writ) (*quoting* Williston on Contracts (rev'd ed.)). Here, in the context of these documents reflecting transfers from father to son, the "services provided" phrase is associated with the "relationship" between the donor and donee. Accordingly, we find

---

[2] Nor does the record contain evidence Billy rendered services for his father in exchange for the shares.

the phrase "in consideration of the relationship and services provided" here refers not to some unspecified but valuable consideration but to those arising from the familial relationship. *See Stewart v. Damron,* 63 Ariz. 158, 167, 160 P.2d 321, 325 (1945) (equating love and affection consideration for gift with "services such as association, care, mutual assistance, companionship, understanding, and support"). The phrase does not conclusively demonstrate that W.H. transferred the Watson Foods shares to his son Billy for a valuable consideration inconsistent with a gift.

Nina next argues that the trial court abused its discretion in characterizing the stock as the separate property of Billy because the finding is not supported by factually sufficient evidence.

The essence of Nina's factual insufficiency claim is Billy was undercompensated and received the Watson Foods stock from his father as additional consideration for his services as an officer of Watson Foods. To support this argument, Nina relies on the "services provided" language of the transfer document. She also points to facts surrounding the relationship among Billy, his father, Davis, and Watson Foods. Davis is not related to W.H. or Billy. Yet W.H. transferred an identical number of Class A shares to Billy and Davis each year they served as officers for Watson Foods. Davis's testimony indicated the corporation's performance each year had an impact on the determination of the number of shares W.H. transferred to him and Billy the following year. W.H., Billy, and Davis were the only holders of Class A shares at the time of the merger. At that time, the Class A stock in Watson Foods was valued at $9,000,000. Watson Foods stock was annually appraised for the corporation's employee stock

9

ownership plan. On four occasions during 1995 through 1997, the value of shares transferred to Billy was discounted from the appraised value.[3]

To support the theory of undercompensation, Nina presented at trial a CPA with certification as a valuation analyst. In his opinion, Watson Foods undercompensated Billy a total of $271,000 for 1996 through 1999. This conclusion drew his attention to the transfer documents where he noted the phrase "services provided." He then formed an "impression" of a compensatory element in the transfer documents. In his opinion, "perhaps the after-marriage transfers would constitute services and assets, compensation." As a basis for his opinion concerning the appropriate level of compensation for Billy from Watson Foods, the CPA relied on data he obtained from a website, "salary.com." When asked if this website was generally accepted in the profession, he responded that he knew of its use by a number of certified valuation analysts.

The CPA was subject to a lengthy cross-examination. He explained that he did not consider other salary-reporting websites in making his undercompensation determination. The information obtained from salary.com was particular to a vice president of sales position but was not specifically tailored to Billy. The CPA was not familiar with Billy's job description. But he believed the job description for a vice president of sales obtained from salary.com was appropriate "based on what little [he]

---

[3] Correspondence contained in the record from Billy's accountant mentions, in general terms, discounting based on a lack of marketability and minority shareholder status.

knew" about Billy's work. In making his evaluation, the CPA did not inquire of Watson Foods or Sysco Texas of Billy's job responsibilities. He could not say if salary.com included information about the food service industry in west Texas and agreed the information on which he relied was from unknown industries. The CPA was not aware of positions in Lubbock comparable to Billy's nor did he know how Billy's salary was calculated. In his opinion, establishing a rate of compensation is an internal matter subject to outside influences such as competition. He believed profitability of the company could also impact salary. Except for his belief that Billy was undercompensated, the CPA agreed that gifting of stock by W.H., with corresponding reporting on gift tax returns, was a "typical" approach in estate planning.

The evidence showed W.H. began transferring Watson Foods stock to Billy and Davis in 1985. W.H. testified that he initiated the program of stock transfers on advice of tax professionals for the purpose of estate planning. He received nothing of monetary value from Billy in return for the stock and added that it was not expected. He believed the transfer documents were prepared by his accountant. Gift tax returns filed by W.H. were admitted at trial. These reported gifts of Watson Foods stock to Billy and Davis as well as gifts of units in another entity, Watson Development, Ltd., to W.H.'s other two children. The record contains no evidence that Billy rendered toil or labor for his father in consideration for valuable compensation. On cross-examination, W.H. agreed that he set the salaries of Billy and Davis for Watson Foods.

Davis testified that during the 1980s, W.H. appointed him president of Watson Foods and Billy vice president. W.H. also began gifting Watson Foods stock to Davis and Billy. According to Davis, no consideration for the stock passed from Davis and

11

Billy to W.H.  At the time of the merger, Billy and Davis each possessed approximately 12.25 percent of Watson Foods Class A stock.  On cross-examination, Davis agreed that his money and that of Billy was "tied up" in the corporation.

Nina testified that before marriage Billy told her nothing about his shares of Watson Foods.  And during marriage he stated that his pay was not adequate.  Billy testified that in a premarital conversation he told Nina of the Watson Foods stock and its status as a gift from his father.

As trier of fact the court was the exclusive judge of the credibility of the witnesses and the weight to be given their testimony.  *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).  Giving due consideration to the evidence that the trial court could reasonably have found to be clear and convincing, we find the evidence was both legally and factually sufficient to support the trial court's finding that the stock was the separate property of Billy.  Accordingly, we overrule Nina's first issue.

The Earnout

In her second issue, Nina argues the trial court abused its discretion by classifying proceeds received by Billy from Sysco Texas under the earnout agreement as Billy's separate property.  Nina advances her argument through three grounds.  Her first contention depends, however, on the presupposition that the trial court abused its discretion by characterizing the Watson Foods stock as Billy's separate property.  Because we have found the trial court did not mischaracterize the stock, and did not, accordingly, abuse its discretion, we focus on Nina's remaining two grounds.  These issue from the contention that the earnout proceeds were dependent on the profitability

12

of Sysco Texas, a company in which Billy was an executive officer responsible for sales. Nina contends the earnout proceeds were income to the community because they were either compensation for Billy's labor or income from his separate property.

The parties do not present disputed material issues of fact pertaining to characterization of the earnout proceeds. Rather, our task again involves examination of documents neither party claims are ambiguous. In the sale of a business employing an earnout agreement as part of the purchase consideration, the buyer pays an agreed "up-front" portion of the purchase price with the final amount determined by the future profits of the business. Ordinarily the seller participates in management of the business for a time following closure of the sale. *In re A.P.F. Co.*, 270 B.R. 567, 572 n.8 (Bankr. D. Del. 2001).

The merger agreement provides the shareholders of Watson Foods would receive, as consideration for their shares, $9,060,066 plus "Earnout Cash." In this respect, the agreement further provides the Watson shareholders "shall have the right to earn up to $4 million in cash ('Earnout Cash') over a three-year period based upon achievement of operating results of Surviving Corporation [Sysco Texas] during such three-year period." The particular conditions for obtaining the earnout cash are specified by a contemporaneously executed "Earnout Agreement." The parties to the earnout agreement are Sysco, Sysco Texas, W.H., Billy, and Davis. It identifies the three individuals as "Earnout Shareholders." The earnout shareholders are paid according to their percentage of Class A share ownership in Watson Foods. Under the agreement Billy was paid $500,000 of which $353,907.03 remained in an account at the time of the divorce proceeding. We find these contractual provisions consistent with an

13

agreement conditioning the final payment of consideration for the sale of a business on the future performance of the business. Such language is not, on the other hand, consistent with an employee bonus arrangement.

The targeted pre-tax earning goals for Sysco Texas were a flat, unchanging percentage for each of the three years. This is consistent with an agreement making payment of the final purchase price of a business contingent on maintaining agreed, targeted earnings following the sale. *See A.P.F.*, 270 B.R. at 572. Conversely, it is not consistent with an incentive earning agreement that rewards employees for achieving an agreed performance level or profit amount. *Id.*

The merger agreement provides a conditional offer of employment to Watson Foods employees on "substantially the same terms and conditions" as afforded by Watson Foods. Notably, the merger agreement and earnout agreement do not treat earnout cash as additional compensation for W.H., Billy, and Davis. *See A.P.F.*, 270 B.R. at 573. Indeed, the agreements do not require continued employment of the shareholders as a condition to the payment of the earnout agreement.

The parties do not point us to, nor do we find, any record fact or legal authority leading to a conclusion other than the earnout cash was the final payment of consideration for the surrender by W.H., Billy, and Davis of their shares of stock in Watson Foods. We accordingly find the trial court did not abuse its discretion by characterizing the earnout cash received by Billy as his separate property. Nina's second issue is overruled.

14

By her final issue, Nina seeks remand for a just and right division of the community estate, based on findings by this court that the trial court abused its discretion in characterizing the Watson Foods stock and earnout cash as Billy's separate property. Because we have found no error by the trial court, discussion of Nina's third issue is unnecessary to our disposition of the appeal. Tex. R. App. P. 47.1.

## Conclusion

Having overruled Nina's issues necessary to the disposition of the appeal, we affirm the judgment of the trial court.

James T. Campbell
Justice