United States Court of Appeals,

Fifth Circuit.

No. 93-3013.

In the Matter of OXFORD MANAGEMENT, INC., Debtor.

Michael CHIASSON, Trustee of Chapter 7 Bankruptcy Estate of Oxford Management, Inc., Appellants,

v.

J. LOUIS MATHERNE AND ASSOCIATES, Appellees.

In the Matter of OXFORD MANAGEMENT INC., Debtor.

Michael CHIASSON, Trustee of Chapter 7 Bankruptcy Estate of Oxford Management, Inc., Appellant,

v.

Katherine A. BINGLER, Appellee.

Oct. 27, 1993.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before WIENER and EMILIO M. GARZA, Circuit Judges and LITTLE[*], District Judge.

LITTLE, District Judge:

The petitioner, Oxford Management, Inc. ("Oxford"), filed for bankruptcy under Chapter 11 of the Bankruptcy Code. Thereafter, the appellees, Katherine A. Bingler ("Bingler") and J. Louis Matherne & Associates ("Matherne"), each brought suit against Oxford to collect monies owed from the lease of commercial office space. The bankruptcy court found that each appellee was entitled to its fee and ordered the funds harbored in an escrow account. The order was affirmed on appeal by the United States District Court following consolidation of the two separate proceedings. The petitioner now appeals the district court's ruling, asserting that the order was erroneous as a matter of law because the fees or commissions are the property of the bankruptcy estate and may only be disbursed in accordance with the provisions of the Bankruptcy Code. Because we find that the bankruptcy court abused its discretion under 11 U.S.C. § 105(a) when it required the appellant to pay

[*]District Judge of the Western District of Louisiana, sitting by designation.

the appellees their claims, we reverse.

I.

Oxford Management, Inc.[1] is a broker which provides commercial leasing services. In February 1983, Oxford and appellee Bingler entered into a contract whereby Bingler agreed to act as an independent contractor and bring to Oxford commercial leases. On December 6, 1984, Oxford entered into a rental agreement with Fidinam U.S.A., Inc. ("Fidinam") in which Oxford agreed to furnish commercial leasing services to Fidinam relative to the Place St. Charles office project in New Orleans, which Fidinam owned. Bingler and Oxford agreed that Bingler would be the leasing specialist to the project.

In return for her services, Bingler received a commission equal to 47 of the monthly rent owned to Fidinam under leases generated by Bingler. In accordance with the agreement between Oxford and Fidinam, Fidinam would pay 67 of the rental value to Oxford, who placed the money in its general operating account. Oxford would then retain 27 of the commission and forward the remaining 47 to Bingler. The funds received from Fidinam were not segregated in any respect from Oxford's other funds.

Soon after the execution of the rental agreement between Oxford and Fidinam, the law firm of Plauche & Maselli became interested in leasing space in the Place St. Charles. Plauche & Maselli enlisted the brokerage services of appellee Matherne, who negotiated the terms of a lease.[2] Oxford

---

[1]Oxford is the successor-in-interest to Latter & Blum's commercial leasing division as of September 30, 1986. The rental agreements with Katherine A. Bingler and J. Louis Matherne were executed under the name of Latter & Blum, but Oxford is bound by the conditions of these agreements. For clarity, Latter & Blum and/or Oxford will hereinafter be collectively referred to as "Oxford."

[2]Under Louisiana Real Estate License Law, La.Rev.Stat.Ann. §§ 37:1430-1468 (West 1988 & Supp.1993) and the rules and regulations promulgated by the Louisiana Real Estate Commission, where property is leased or sold by someone other than its owner, a lease or sale must take place through a licensed broker. The broker representing the lessor or owner is known as the "listing broker" or "listing agent." In the case of commercial leases, potential lessees or tenants are often represented by a "tenant's broker" or "tenant's agent." In this case, Matherne served as a tenant's broker, while Oxford served as the listing broker. Bingler, as an independent contractor, had a somewhat different relationship with Oxford. Nonetheless, since the manner in which the appellees were paid their commissions was the same, the bankruptcy court has treated the appellees as similarly situated. We will follow that lead, as did the district court.

and Matherne agreed that Matherne's commission would be governed by the Oxford/Fidinam rental agreement and would equal 47 of the total net rent of the Plauche & Maselli lease. As with Bingler, Oxford was to pay Matherne its commission upon receipt of the money from Fidinam.[3]

This method of payment was in operation until July 1990, at which time Oxford discontinued payments to the appellees despite the fact that Fidinam continued to send the entire 67 commission to Oxford. On November 2, 1990, Oxford filed for bankruptcy under Chapter 11 of the Bankruptcy Code. The appellees then filed separate complaints for injunctive relief, declaratory relief and turnover of funds, and motions for temporary restraining orders and injunctive relief.

The bankruptcy court reviewed the contracts between Oxford and Fidinam, Oxford and Bingler, and Oxford and Matherne and denied the appellees' motions on the grounds that the appellees had a debtor-creditor relationship with the appellant and, as such, ruled that the commissions belonged to Oxford. Nonetheless, the court employed its equitable powers under 11 U.S.C. § 105(a) to order the appellant to comply with the appellees' demands for payment.[4]

Oxford appealed the decision to the district court. The district court affirmed the bankruptcy court's order compelling Oxford to pay the appellees the commissions and agreed with the bankruptcy court's use of its equity powers under 11 U.S.C. § 105(a) to implement the order.

Oxford then filed this appeal, challenging whether the bankruptcy court erred in ordering Oxford to pay to appellees post-petition funds in satisfaction of obligations that arose by pre-petition agreement, and whether the bankruptcy court abused its equity powers under 11 U.S.C. § 105(a) in ordering the payments.

## II.

A bankruptcy court's finding of fact are subject to the clearly erroneous standard of review. *In re Young,* 995 F.2d 547, 548 (5th Cir.1993). This court will strictly apply this standard when the

---

[3]This method of payment is the industry practice since, under La.Rev.Stat.Ann. § 37:1446, associate brokers shall not accept a commission except from their sponsoring broker.

[4]The bankruptcy court originally commanded payment of the funds from an escrow account. This account was terminated upon request of the appellant. At the same time, however, as the court terminated the account, the court ordered the appellant to pay the commissions since the funds had been set aside for the appellees.

district court has affirmed the bankruptcy court's findings and will reverse only when this court is left with "the definite and firm conviction that a mistake has been made." *Id.* Conclusions of law are reviewed de novo. *Id.; see also In re Allison,* 960 F.2d 481, 483 (5th Cir.1992).

A.

The appellant objects to the bankruptcy court's determination that post-petition funds be used to satisfy the appellees claims. The appellant argues that the court, having determined that Oxford and the appellees have a debtor-creditor relationship, erroneously used its equitable powers under 11 U.S.C. § 105(a) to compel payment. We agree with the appellant and hold that the bankruptcy court abused its discretion in the application of this statute.

Section 105(a) authorizes a bankruptcy court to fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code.[5] For instance, the section permits bankruptcy courts to issue injunctions. But, the powers granted by that statute must be exercised in a manner that is consistent with the Bankruptcy Code. *See United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986); *In re Texas Consumer Finance Corp.,* 480 F.2d 1261, 1265 (5th Cir.1973). The "statute does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *United States v. Sutton,* 786 F.2d at 1308.

The bankruptcy court concluded that the commissions are part of the bankruptcy estate and that the appellees have the status of general unsecured creditors. At the same time, the court decided that Oxford "owed" the appellees their commissions and that equity necessitated payment. We observe, however, that the Bankruptcy Act did not give bankruptcy courts the authority to grant compensation of post-petition funds except as provided by the Bankruptcy Code. *Matter of Hammers,* 988 F.2d 32, 34 n. 1 (5th Cir.1993). Neither the appellees nor the bankruptcy court cited a specific provision of the Code that would allow the payment of post-petition funds to satisfy

---

[5]Section 105(a) provides: "The court may issue any order, process, or judgement that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

pre-petition claims. By commanding payment, the bankruptcy court elevated the status of the appellees above that of the other general unsecured creditors and deviated from the pro rata scheme of distribution envisioned by the Code. *See* 11 U.S.C. § 726(b) (Law.Co-op.1987). This order effectuated an impermissible substantive alteration of the Code's provisions. For this reason, we find that the bankruptcy court was in error when it used its equity powers to command the payment of the appellees' commissions.

B.

Having concluded that the bankruptcy court acted beyond the equitable powers granted by section 105(a), we now turn to whether the bankruptcy court was correct in concluding that the commissions were part of the bankruptcy estate. Oxford renews its assertion that the bankruptcy court properly found that the funds are part of the debtor's estate. Bingler and Matherne, on the other hand, advance numerous arguments in support of the position that the pre-petition agreements rendered the appellees the equitable owners of the funds. In other words, the bankruptcy court's conclusion was correct, but for the wrong reasons.

11 U.S.C. § 541(d) is the general provision addressing property of the bankruptcy estate. It provides that the estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(d) (Law.Co-op.1986). The section does not, however, create or define property interests. Therefore, in the absence of controlling federal bankruptcy law, the substantive nature of property rights is defined by reference to state law. *Butner v. United States,* 440 U.S. 48, 55-56, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).[6] The bankruptcy court properly looked to Louisiana law to determine whether Oxford's estate owned the commissions under the terms of the contracts between the parties. An interpretation of an unambiguous contract is a question of law and will be reviewed de novo. *Calpetco 1981 v. Marshall Exploration, Inc.,* 989 F.2d 1408, 1413 (5th Cir.1993).

---

[6]*See also Lewis v. Manufacturers National Bank,* 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323 (1961) (Non-uniform treatment of property interests by both State and federal courts within a state enables parties to receive windfalls "by reason of the happenstance of bankruptcy."); *Matter of Ford,* 967 F.2d 1047, 1050 n. 6 (5th Cir.1992).

The appellant argues that the terms of the contracts between the parties explicitly created a debtor-creditor relationship. The contract between Oxford and Fidinam provides that the whole 67 commission is to be paid directly to Oxford, with Oxford then obligated to pay the appellees their shares. Since Bingler and Matherne were not parties to the contract between Oxford and Fidinam, they could not directly receive their payments from Fidinam but were dependant upon Oxford for payment pursuant to the terms of their respective agreements with Oxford. The bankruptcy court interpreted these contracts to mean that the commissions paid to Oxford by Fidinam were Oxford's property, and that while Oxford had an obligation to pay the appellees under separate and distinct contracts, the relationship between the parties was that of debtor and creditor. We agree with these conclusions and concur in the judgment that the appellees claims arose pre-petition,[7] that the funds are part of the debtor's estate, and the relationship between the appellant and the appellees is that of debtor-creditor.

## 1.

The appellees advance several arguments in opposition to these conclusions, the first of which is based on a constructive trust theory. The appellees maintain that under Louisiana law governing real estate licenses, a scheme was created that forms the basis of an equitable interest or trust. *See* La.Rev.Stat.Ann. §§ 37:1430-1468 (West 1989 & Supp.1993). For instance, § 37:1446(B) requires associate brokers to receive commissions through the sponsoring broker, in this case Oxford. Moreover, § 37:1455(A)(5) permits a broker to be censured or to have his license revoked for "failure to remit money coming into his possession belonging to others." The appellees maintain that since direct receipt of the commissions is made impossible by this scheme, and since sanctions for failure to remit are permitted by the statute, the commissions received by the sponsoring broker, in

_____

[7]A "claim" is defined under 11 U.S.C. § 101(4)(A) (Law.Co-op.Supp.1993) as a "right to payment" and includes those rights that are unliquidated, contingent, and unmatured. If a right to payment becomes vested prior to commencement of the bankruptcy case, the claim becomes a pre-petition claim. A claim is not rendered a post-petition claim simply by the fact that time for payment is triggered by an event that happens after the filing of the petition. *In re Murray Industries, Inc.,* 110 B.R. 585, 588-89 (Bankr.M.D.Fla.1990). All pre-petition unsecured claims are paid pro-rata along with all claims of that kind in accordance with the provisions of 11 U.S.C. § 726(b). All funds acquired by the debtor that are received post-petition are to be used only in accordance with the provisions of the Bankruptcy Code. 11 U.S.C. § 363 (Law.Co-op.1985).

this case Oxford, are meant to "pass-through" the sponsoring broker to the associate brokers, Bingler and Matherne. As such, Oxford merely holds the funds in trust for the associate brokers.

When the property of an estate is alleged to be held in trust, the burden of establishing the trust's existence rests with the claimants.[8] "Additionally, where the recipient of the funds can by agreement use them as his own and commingle them with his own monies, a debtor-creditor relationship exists, not a trust."[9] In our case, the commissions remitted by Fidinam to Oxford were placed in Oxford's general operating account and commingled with Oxford's other funds. No agreement existed which prohibited Oxford from using the funds for other purposes. Therefore, the appellees argument in favor of the creation of a trust is insupportable.

The appellees also suggest that a constructive trust was created, and they rely on section 541(d) of the Bankruptcy Code and its legislative history for support of that proposition. The appellees assert that section 541(d) recognizes that some property ostensibly owned by the debtor in possession is not the property of the debtor's estate.[10] Further, they direct our attention to the section's legislative history, which includes an example of property that is held in constructive trust for the true owner.[11] The appellees also note that although Louisiana law does not recognize

---

[8]*See* 4 *Collier on Bankruptcy,* § 541.13, at 541-76 to -78 (15th ed. 1993). In addition to proving his title, the claimant must identify the trust fund or property and, where the fund or property has been mingled with the general property of the debtor, trace the property. *Id.* at 541-77.

[9]*Id.* at 541-77.

[10]11 U.S.C. § 541(d) reemphasizes the principle of section 541(a)(1), which establishes that the debtor's estate encompasses all legal or equitable interests of the debtor as of the commencement of the case. Subsection (d) also sets forth the concept that property limited in the hands of the debtor is similarly limited in the hands of the debtor's estate, and provides the example of "a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title in order to service or supervise the servicing of the mortgage or interest." While the appellees use this provision to support their theory that Oxford retains only legal interest in the commissions such that the commissions are not part of the debtor's estate, it is clear that this section was written as a concession to the secondary mortgage industry. *See* 4 *Collier on Bankruptcy* ¶ 541.24, at 541-116 to -118 (15th ed. 1993).

[11]The appellees rely on the following example discussed in the legislative history of § 541(d): "Situations occasionally arise where property ostensibly belonging to the debtor will not actually be the property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was

constructive trusts, the concept is an equitable one and is applicable in situations such as this one, where funds are "earmarked" for a specific creditor.

While it is true that the Bankruptcy Code recognizes situations in which some property ostensibly owned by the debtor is not the property of the debtor's estate, the examples raised by the appellees are inapplicable here. First, section 541(d) refers to secondary mortgages, not commissions. Second, Louisiana does not recognize constructive trusts. *See In re Emerald Oil Co.,* 807 F.2d 1234, 1238 (5th Cir.1987). Section 541 defines those interests of the debtor that are transferrable to the debtor's estate, but it leaves to state law the task of defining the extent of the debtor's interest.[12] Therefore, while the legislative history mentions the possibility of a constructive trust under certain circumstances, the final resolution is made by nonbankruptcy law. In our case, that law is Louisiana law. Additionally, we reject the appellees contention that the funds were "earmarked" for them. Rather, the funds were placed in an escrow account by the bankruptcy court pending resolution of the case. This account was later terminated. Finally, the appellees' reliance on section 541's legislative history is misplaced. It is well established that where a statute is unambiguous, reference to legislative history is unnecessary. *See, e.g., Barnhill v. Johnson,* 503 U.S. ----, ----, 112 S.Ct. 1386, 1391, 118 L.Ed.2d 39 (1992) ("[A]ppeals to statutory history are well-taken only to resolve "statutory ambiguity.' "); *Toibb v. Radloff,* 501 U.S. ----, ----, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991).

2.

The appellees' next argument is that the contractual arrangement between the parties created an agency relationship. Specifically, the appellees allege that Oxford, by collecting the commissions on the appellees' behalf, acted as their agent. Under Louisiana law, an agency relationship is created either by express appointment of a mandatary under Civil Code Article 2985 or by implied appointment arising from apparent authority. Civil Code Article 2985 (West 1979); *see also Richard*

---

reimbursement, the payment would actually be held in constructive trust for the person to whom the bill was owed." S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5868.

[12]*See* 4 *Collier on Bankruptcy* ¶ 541.02[1], at 541-10.1 to -13 (15th ed. 1993).

*A. Cheramie Enterprises, Inc. v. Mt. Airy Refining Co.,* 708 F.2d 156 (5th Cir.1983). An agency relationship is created by implication "when, from the nature of the principal's business and the position of the agent within that business, the agent is deemed to have permission from the principal to undertake certain acts...." *AAA Tire & Export, Inc. v. Big Chief Truck Lines, Inc.,* 385 So.2d 426, 429 (La.App.1980). In other words, implied agency involves permission to act, even though permission is not explicitly established orally or in writing. *Id.* An implied agency is frequently established by the conduct and communication of the parties and the circumstances of the particular case. *Busby v. Walker,* 84 So.2d 304 (La.App.1955).

Under Louisiana law, an agency relationship cannot be presumed, it must be clearly established. *Patrick v. Patrick,* 230 So.2d 759, 762 (La.App.1970). The appellees fail to establish that an express appointment of Oxford as a mandatary was contemplated by the agreements between the parties. The unambiguous language of the contracts between Oxford and the appellees provides that Oxford agreed to pay the outside broker a commission. Again, this is language of indebtedness that connotes a creditor-debtor relationship. In so far as the record does not support the finding that an implied appointment was intended by the parties, we decline to create a relationship between the parties that they themselves did not intend.

3.

Third, the appellees maintain that the agreements between the parties created a contract of deposit. Specifically, the appellees assert that Oxford, upon receipt of the commissions from Fidinam, became the depositary of the appellees' 47 commissions. La.Civ.Code Ann. art. 2926 defines "deposit" as "an act by which a person receives the property of another, binding himself to preserve it and return it in kind." A deposit is a nominate contract created by mutual consent of the parties, whether express or implied. La.Civ.Code Ann. arts. 2932-2933 (West 1979). The main requisites for the creation of a depositor-depositary relationship are "the mutual consent of the parties and the delivery of the property." *Harper v. Brown & Root, Inc.,* 391 So.2d 1170, 1172 (La.1980). *See also* Michael H. Rubin, *Bailment & Deposit in Louisiana,* 35 La.L.Rev. 825, 828 (1975).

With these principles in mind, we conclude that a deposit was not created. In order for a

deposit to have occurred, it must be shown that Oxford consented, either expressly or impliedly, to act as a depositary on the appellees behalf, followed by receipt of the property in question. The situation here does not apply. Certainly there was no explicit agreement between Oxford and Fidinam providing for Oxford's fulfillment of this role, nor was there any delivery of property to Oxford by the appellees from which an implied deposit can be inferred. As discussed above, Oxford and the appellees had a debtor-creditor relationship. Their arrangement falls short, however, of demonstrating either consent or intent to form a depositor-depositary relationship.

4.

Finally, the appellees suggest that they are entitled to their commissions as third party beneficiaries of the brokerage commission agreement between Oxford and Fidinam. La.Civ.Code Ann. arts. 1978-1982 (West 1993) govern third-party beneficiary contracts, or stipulations *pour autrui.* Article 1978 provides that "[a] contracting party may stipulate a benefit for a third person called a third party beneficiary." A third party beneficiary contract is created when the party entitled to receive the benefit, the promisee, instructs the promisor to confer the benefit upon a third party, and the promisor then agrees to do so. *Wagner & Truax Co. v. Barnett Enterprises, Inc.,* 447 So.2d 1255 (La.App.1984); *see also Miller v. Pick,* 467 So.2d 74 (La.App.), *writ denied,* 472 So.2d 36 (La.1985).

In this case, there was no agreement between Oxford and Fidinam instructing Fidinam to pay the appellees their commissions. Rather, Fidinam agreed to pay Oxford the entire commission, leaving to Oxford the task of forwarding to the appellees their portions. Furthermore, at the time Oxford and Fidinam signed their contract, there was no way Fidinam could have known that Oxford would be affiliated with Bingler and Matherne. Thus, Fidinam's only obligation was to pay Oxford. Since a stipulation *pour autrui* must be agreed upon by the promisor, this argument must also fail.

III.

For the foregoing reasons, we conclude that the bankruptcy court erred in ordering the appellant to pay to the appellees post-petition funds in satisfaction of pre-petition obligations. Accordingly, the bankruptcy court's order, as affirmed by the district court, is REVERSED. This

matter is REMANDED to the bankruptcy court for further administration not inconsistent with this opinion.