In re PETRO–MARK, UTAH, LLC, Debtor.

Bank One, N.A., Plaintiff,

v.

Gascard Inc., Fleetcor Technologies Inc., Petro–Mark Utah, LLC, and Macro Oil Company, Inc., Defendants.

Bankruptcy No. 03–49347–DML–11. Adversary No. 03–4425–DML.

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

March 17, 2004.

Mark Andrus, Lafayette, LA, for Fleetcor Technologies, Inc., GasCard, Inc., Macro Oil Company, Inc., Defendants.

Andree Matherne Cullens, Baton Rouge, LA, for Bank One, N.A., Counter–Defendant.

J. Robert Forshey, Forshey and Prostok, Ft. Worth, TX, for Macro Oil Company, Inc., Fleetcor Technologies, Inc., GasCard, Inc., Defendants.

Brett P. Furr, Taylor, Porter, Brooks and Phillips, Baton Rouge, LA, for Bank One, N.A., Plaintiff.

Barbara Elaine Hargis, Harris, Finley and Bogle, Ft. Worth, TX, for Bank One, N.A., Plaintiff.

St. Clair Newbern, III, Law Offices of St. Clair Newbern III, P.C., Ft. Worth, TX, for Petro–Mark Utah, LLC, Defendant.

## MEMORANDUM OPINION AND ORDER

DENNIS MICHAEL LYNN, Bankruptcy Judge.

Before the court is Bank One, N.A.'s ("Plaintiff") Motion for Summary Judgment (the "Motion") filed December 15, 2003. Petro–Mark Utah, LLC's ("Debtor") Response to the Motion was filed January 20, 2004. Macro Oil Company ("Macro"), FleetCor Technologies, Inc. ("FleetCor"), and Gascard, Inc.'s ("Gascard") (collectively "Defendants") Response to the Motion was also filed on January 20, 2004, and subsequently supplemented on January 27, 2004. Plaintiff's Reply was filed January 26, 2004. A hearing on the Motion was held on Janu-

ary 27, 2004, and, as allowed by the court, Plaintiff and Defendants filed Post–Hearing Briefs on February 6, 2004. This matter is subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157. Having considered the arguments of counsel, evidence presented, and record before the court, Plaintiff's Motion for Summary Judgment shall be, and hereby is, **GRANTED** to the extent set forth below.

## I. BACKGROUND

The relevant facts are largely undisputed. FleetCor is a master licensor of the Gascard Fleet Fuel Management System ("Gascard System"). The Gascard System is composed of certain trademarks, computer technology, computer software, trade secrets, and business methods which operate together to allow vehicle fleet owners to receive comprehensive management reports and to manage fuel costs, fuel usage, and other aspects of their fleets. The Gascard System is operated through licensees who are authorized to conduct business in specific geographical trade areas within specific states, including Utah.

Licensees of the Gascard System may solicit customers and establish accepting retail outlets where Gascard System customers can purchase fuel and fuel-related products and services. Gascard System customers are given "Access Cards" which allow the customers' vehicle operators to make credit/debit purchases at participating Gascard System sites. Each Gascard System licensee agrees, with certain exceptions, to accept at participating retail sites within its territory Gascard System Access Cards issued by other licensees. When a Gascard System Access Card is used at an accepting site, information about the transaction, including the identity of the customer and participating merchant, the date and time of the transaction,

the products and/or services purchased, and the purchase price, is simultaneously transmitted to a Gascard System central computer.

A transaction in which a customer enlisted by the licensee purchases products from a merchant enlisted by another licensee is a "network" transaction. A transaction in which a licensee's customer makes purchases from the licensee's own enlisted merchants is a "local" transaction. All network and local transactions are entered into the Gascard System at the point of sale.

Payments for network transactions under the Gascard System are made through network settlements administered by FleetCor. In a network settlement, the net amount owed by or to each licensee for the aggregate network transactions of the licensee's customers for each settlement cycle is debited from or credited to the licensee by FleetCor. If the total amount charged by the licensee's customers to the merchants of other licensees exceeds the amount charged by the licensee's customers to the licensee's own merchants in a given cycle, the licensee's account is debited. If the amount charged by the licensee's customers to the licensee's own merchants exceeds the amount charged by the licensee's customers to the merchants of other licensees, the licensee will receive a credit to its account for the net difference. The debits from and credits to a licensee's account are made through electronic Automated Clearing House ("ACH") transactions pursuant to each licensee's specific ACH authorization to its bank.

To make an electronic debit, FleetCor causes its bank to initiate the transaction, send the transaction through the Federal Reserve System to the licensee's bank, deduct the funds from the licensee's account, and send the funds back through the Federal Reserve System to FleetCor's

account. Prior to initiating an ACH debit, FleetCor sends the licensee a report reflecting all network transactions of the licensee's customers and a notice that a debit will be made. Unless the licensee notifies FleetCor of a problem with the report within five business days, the ACH debit is initiated for the amount reflected in the report. ACH debits are generally initiated every five to ten business days on each licensee's account.

On August 14, 2001, Debtor executed its guarantee on indebtedness evidenced by Petro–Mark Holding Company's certain promissory note of same date. As security for the indebtedness, Debtor contemporaneously executed a Security Agreement granting in Plaintiff's favor a continuing security interest in Debtor's collateral. Plaintiff's UCC Financing Statement ("Form UCC1") and Exhibit "A" to Financing Statement describing the collateral were file-stamped by the Secretary of State for the State of Colorado, No. 20012076169, on August 27, 2001.

On August 30, 2001, FleetCor transferred to Macro all of FleetCor's rights to the Gascard System licenses in Utah, including Debtor's. Pursuant to the agreement between FleetCor and Macro, FleetCor continued to administer the network settlements under the Gascard System for and on behalf of Macro.

On December 24, 2001, Macro entered into a Gascard License Renewal Agreement (the "License Agreement") with Debtor for a primary term of twenty-four months.[1] Because the License Agreement renewed Debtor's existing license, Debtor's ACH authorization agreement with FleetCor and standard five-day ACH debit cycle for network settlements remained in place.

In December 2002, three ACH debits for network settlements initiated by FleetCor against Debtor's account with Plaintiff were returned for insufficient funds ("NSF"). In January 2003, additional ACH debits against Debtor's account were returned NSF. During this period, Debtor failed to pay fees due under the License Agreement or to remit any funds collected from Gascard System customers for network transactions, notwithstanding FleetCor's continued settlement on Macro's behalf of Debtor's Gascard System ACH network settlements in accordance with the License Agreement's standard terms.

On January 23, 2003, Macro exercised its rights to terminate Debtor's License Agreement but elected to continue the License Agreement with Debtor on a day-to-day basis pending cure of Debtor's default in payment of fees and other sums due under the License Agreement. The parties' attempts at resolution were unsuccessful, however, and Macro notified Debtor on January 28, 2003, that the License Agreement was finally terminated.

Immediately thereafter Macro and FleetCor filed an action against Debtor in Louisiana state court seeking to enjoin Debtor from disposing of or converting funds then being held or to be collected by Debtor for Gascard System network transactions by Debtor's licensees. On January 31, 2003, the Louisiana court issued an Agreed Temporary Restraining Order (the "TRO") that, *inter alia*, (1) prevented Debtor from taking any action to use, convert, divert, or dispose of any of the proceeds of accounts receivable from Debtor's Gascard System customers for network transactions through January 28, 2003, and received after the date of the Agreed TRO; (2) prevented Debtor from using or disposing of any proceeds of Gascard System

---

1. Although Defendants have collectively opposed Plaintiff's Motion, neither FleetCor nor

Gascard is a signatory to the License Agreement.

accounts receivable in Debtor's possession (not commingled in a deposit account) or received by Debtor after January 31, 2003, or from depositing said proceeds into any bank other than Plaintiff; (3)(a) authorized FleetCor to issue invoices for Debtor's customers' Gascard System network transactions through January 28, 2003, (b) directed that all such payments be remitted to Macro, and (c) required Macro to deposit such payments into an interest-bearing account with Plaintiff; and (4) ordered Macro and Debtor to send a joint letter to Debtor's Gascard System customers directing that payments required under invoices from FleetCor on billings through January 28, 2001, be made to Macro.

Following an evidentiary hearing held February 7, 2003, the Louisiana court filed its Order Granting Preliminary Injunction (the "Preliminary Injunction") on February 24, 2003. The Preliminary Injunction was "granted in the form of the [TRO]" and extended the TRO's provisions on generally the same terms.

On May 2, 2003, pursuant to the provisions of the License Agreement, Defendants filed in the Louisiana court a Statement of Claim for Arbitration Demand before the American Arbitration Association. Plaintiff's request to intervene in the arbitration was denied. The state court action was then stayed pending the outcome of the arbitration proceedings.[2]

On September 30, 2003, prior to trial in Louisiana state court or completion of the arbitration proceedings, Debtor filed its chapter 11 petition for reorganization.

Plaintiff's First Amended Complaint for Declaratory Judgment to Determine Property of the Estate (the "Complaint") was filed in this court on October 29, 2003.

Plaintiff's Complaint alleges that Debtor is the guarantor of a past due and owing promissory note dated August 14, 2001, secured by Plaintiff's perfected security interest in Debtor's "present and future accounts, instruments, and general intangibles, present and after-acquired inventory and equipment." Plaintiff asserts that the funds deposited by Macro into the interest bearing account with Plaintiff pursuant to the Louisiana court's TRO and Preliminary Injunction (1) are proceeds of accounts receivable owned by Debtor; (2) constitute property of Debtor's bankruptcy estate; (3) are subject to Plaintiff's perfected security interest; and (4) should be released and paid over to Plaintiff. Plaintiff's Motion argues that summary judgment on Plaintiff's Complaint is appropriate because the pleadings, stipulation, affidavits, and documents on file with this court show that there is no genuine issue of material fact and that Plaintiff is entitled to judgment as a matter of law.

## II. STANDARD

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotations omitted). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. In making its deter-

---

**2.** Although it appears to this court that the parties previously submitted this matter to arbitration, no party has requested this court to allow the requested arbitration to go forward. In the absence of such a request, the court will exercise its jurisdiction herein.

mination, the court must draw all justifiable inferences in favor of the nonmoving party. *Id.* at 255, 106 S.Ct. 2505.

Once the moving party has initially shown "that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the nonmovant must come forward, after adequate time for discovery, with significant probative evidence showing a triable issue of fact. FED. R. CIV. P. 56(e); *State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir.1990). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue for trial. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428 (5th Cir.1996) (en banc); *SEC v. Recile,* 10 F.3d 1093, 1097 (5th Cir.1993). To defeat a properly supported motion for summary judgment, the nonmovant must present more than a mere scintilla of evidence. *See Anderson,* 477 U.S. at 251, 106 S.Ct. 2505. Rather, the nonmovant must present sufficient evidence upon which a jury could reasonably find in the nonmovant's favor. *Id.*

## III. DISCUSSION

The parties agree, as does this court, that the fundamental issue in this matter is who owns or is entitled to the proceeds of the Gascard System network accounts receivable generated under Debtor's License Agreement and deposited by Macro into an interest bearing account with Plaintiff pursuant to the Louisiana court's earlier TRO and Preliminary Injunction.[3]

Plaintiff argues the proceeds of the network accounts receivable generated and collected by Debtor are owned by Debtor and, consequently, are subject to Plaintiff's perfected security interest in Debtor's present and future accounts and general intangibles.[4] Defendants argue, however, that Debtor was merely a financial intermediary collecting and remitting network funds in accordance with the ACH settlement process; therefore, Debtor's rights in the proceeds collected are limited to Debtor's receipt of the four percent discount paid to all Gascard System licensees based on their participation in the ACH network settlement process.

### *Ownership of Proceeds*

■ The court concludes that Debtor owns the proceeds of the Gascard System network accounts receivable generated under Debtor's License Agreement with Macro. The court believes the License Agreement establishes a contractual creditor/debtor relationship between (1) Debtor, acting as an independent contractor licensee, and (2) Macro, acting in its capacity as a Gascard System licensor. That Debtor's and Macro's accounting relationship is administered by FleetCor through a comprehensive series of network ACH credit and debit settlement transactions does not alter the basic nature of Debtor's and Macro's contractual creditor/debtor relationship.

First, the License Agreement unambiguously provides that Debtor is an independent contractor licensee, *viz.:*

> *Independent Contractors.* You are an independent contractor. This [License] Agreement does not create an agency

---

**3.** At the hearing on January 27, 2004, the court ordered that the funds be transferred to a segregated interest bearing account with Plaintiff in Fort Worth, Texas.

**4.** Debtor's Response states that Debtor "joins with and adopts" Plaintiff's Motion to the extent applicable to Defendants. Debtor disputes only that the proceeds at issue be turned over to Plaintiff.

relationship, partnership, employee relationship, joint venture, or fiduciary relationship between the parties. The parties shall not act as agents for one another, guarantee each other's obligations, or in any way become obligated for the debts or expenses of each other unless agreed to in writing. You must conspicuously identify yourself in all dealings with customers, suppliers, public officials, GASCARD personnel, your employees, and others as the operator of the GASCARD License granted by [Macro]. You must place such other notices of independent ownership on such forms, business cards, stationery, advertising, and materials as [Macro] may require from time to time.

*See* License Agreement ¶ 7.1.

Paragraph 7.1 clearly (1) sets out Debtor's status as an independent contractor; (2) specifically disavows any agency or similar relationship between Debtor and Macro; (3) prohibits shared obligations for the debts or expenses of each to the other unless agreed to in writing; and. (4) exhorts Debtor at all times to make known Debtor's independent ownership in all business dealings. Indeed, the significance placed by Macro on Debtor's strict adherence to the provisions of paragraph 7.1 is buttressed by the License Agreement's specific provision for termination by Macro of Debtor's License Agreement, *without notice to Debtor and without an opportunity to cure*, should Debtor "fail to maintain an independent contractor relationship" with Macro. *See* License Agreement ¶ 13.1.

■ Second, Paragraphs 7.1 and 13.1 of the Lease Agreement belie Defendants' argument that Debtor acted as a "financial intermediary" in the ACH settlement process. On the one hand, Defendants acknowledge that Debtor is precluded from acting as Macro's agent pursuant to the explicit terms of the License Agreement. On the other hand, Defendants insist that Debtor acted as Macro's "financial intermediary," *i.e.,* collecting and holding others' funds for payment to licensees through the ACH network settlement process. Not only is Defendants' exhortation that Debtor is a financial intermediary contrary to its own position that Debtor cannot act as Macro's agent, but Defendants' position is also contrary to fundamental Louisiana law.[5] In order for Defendants' argument to work, either Debtor would have been acting as an agent for Macro or the funds would have been subject to a constructive trust. *See Uhlich v. Medallion Realty, Inc.,* 334 So.2d 788, 791 (La.Ct.App.1976) (concluding that a *"broker or intermediary* is he who is employed to negotiate a matter between two parties, and who, for that reason, is considered as the mandatory[6] of both") (citing LA. CIV. CODE ANN. art. 3016) (emphasis in origi-

---

**5.** The court notes that counsel agree the License Agreement "shall be governed by the substantive laws of the state of Louisiana." *See* License Agreement ¶ 15.8; *Chiasson v. Matherne and Assocs. (In re Oxford Mgmt., Inc.),* 4 F.3d 1329, 1334 (5th Cir.1993) (determining that the substantive nature of debtor's legal and equitable rights in property of the estate is, absent controlling federal bankruptcy law, defined by reference to state law). The court also notes that the parties do not dispute that Macro was the scrivener of the License Agreement, *see* License Agreement ¶ 1, or that "[u]nder Louisiana law, ambigu-

ous clauses are construed against the drafter of the contract." *United States Abatement Corp. v. Mobil Exploration and Producing U.S. Inc. (In re United States Abatement Corp.),* 79 F.3d 393, 400 (5th Cir.1996). *See also Ford v. NYLCare Health Plans of the Gulf Coast, Inc.,* 141 F.3d 243, 249 (5th Cir.1998) (construing ambiguous contract language against the party who drafted it).

**6.** The equivalent of an "agent" under Louisiana law.

nal); *Chiasson v. Matherne and Assocs.* *(In re Oxford Mgmt.)*, 4 F.3d 1329, 1336 (5th Cir.1993) ("Louisiana does not recognize constructive trusts."). Moreover, there can be no question that Debtor is not a "financial entity" as contemplated within the accepted definition of "financial intermediary." *See* BLACK'S LAW DICTIONARY 645 (7th ed.1999) (defining "financial intermediary" as a *"financial entity*—usu. a commercial bank—that advances the transfer of funds between borrowers and lenders, buyers and sellers, and investors and savers") (emphasis added).

Third, the disputed network accounts receivable were generated by customers who contracted with and promised to pay Debtor, not Defendants. Debtor's "Credit Application and Agreement" specifically provides that "Applicant's signature attests financial responsibility, ability and and [sic] willingness to pay all balances due to [Debtor] in accordance with the agreed terms." In addition, the License Agreement provides that Debtor "shall be solely responsible for extending credit to [Debtor's] Customers and for collecting any payments owed to [Debtor] or another GASCARD licensee for purchases made by [Debtor's] Customers on the System." *See* License Agreement ¶ 9.9. Finally, the License Agreement entitles Macro to initiate the standard ten-day ACH network settlement process *against Debtor* for payment of Gascard System fees and charges regardless of Debtor's receipt of payment from its customers. *See* License Agreement ¶ 5.2.

 There is no contractual language or other evidence to suggest that Debtor's

customers are in any way directly obligated to Macro or the network or that Macro or the network can collect directly from Debtor's customers. Rather, the License Agreement imposes an obligation on Debtor to pay Macro for the charges made by Debtor's customers regardless of Debtor's collection of such funds from its customers. Thus, Debtor alone bears the risk of loss of its customers' nonpayment and Debtor alone is entitled to payment from its customers.[7] That monies collected by Debtor and paid to Macro may in turn be paid by Macro to other Gascard licensees in no way alters the independent creditor/debtor relationship Debtor has with its customers *vis-à-vis* the independent creditor/debtor relationship between Debtor and Macro.

 Fourth, consistent with the above reasoning, the court is not persuaded by Defendants' argument that Defendants have a right of subrogation to the proceeds of Debtor's network accounts receivable. "Subrogation" is defined by Louisiana law as "the substitution of one person to the rights of another." LA. CIV. CODE ANN. art. 1825 (2004). "When subrogation results from a person's performance of the obligation of another, that obligation subsists in favor of the person who performed it who may avail himself of the action and security of the original obligee against the obligor, but is extinguished for the original obligee." *Id.* art. 1826. Thus, only when a third party makes payment to the *original* obligee may such third party be substituted to the rights of the original obligee against the obligor.

---

7. Only through the intervention of the Louisiana court was Macro empowered to communicate with and collect from Debtor's customers. Had the Louisiana court not acted, the funds in question would have reached Debtor's bank account and, if held that account on the date of filing of the chapter 11 petition, would have become property of the estate, free of any claim cognizable in bankruptcy by Macro. That the funds were escrowed by court order does not, in itself, result in a change in their ownership or the creation of rights in Macro superior to those of the bankruptcy estate.

Here, although FleetCor, acting on Macro's behalf, paid Macro's obligations to other licensees via standard ACH network settlement transactions, Debtor had no obligation in the first instance to make Macro's payments to the other licensees. Debtor was independently obligated to pay Macro for the purchases made by Debtor's customers within the Gascard System; and Macro, not Debtor, was independently obligated to pay the other network licensees for charges made through the Gascard System. Indeed, Defendants acknowledge that Macro, as licensor under the License Agreement, "agreed to make payments on the Gascard network." Consequently, Defendants' argument that Louisiana provides for subrogation by Defendants against Debtor by operation of law is inapposite. *Cf. id.* art. 1829(3) (providing that "[s]ubrogation takes place by operation of law: ... [i]n favor of an obligor who pays a debt he owes with others or for others and who has recourse against those others as a result of the payment") *with* License Agreement ¶ 7.1 (providing that Debtor and Macro cannot "in any way become obligated for the debts or expenses of each other"). Accordingly, the court is unpersuaded that a right of subrogation inured to the benefit of Defendants.

Having determined that (1) Debtor is correctly characterized as an independent contractor; (2) Debtor did not act as a financial intermediary for the payment of funds through the ACH network settlement process; (3) Debtor had an independent creditor/debtor relationship with Macro; (4) Debtor had an independent creditor/debtor relationship with its customers; and (5) no right of subrogation inured to the benefit of Defendants against Debtor, the court finds that Debtor owns the proceeds of the Gascard System network accounts receivable generated under Debtor's License Agreement and now deposited in an interest bearing account with Plaintiff in Fort Worth, Texas.

### Security Interest in Proceeds

As a threshold matter, the court notes that (1) Defendants agree that Plaintiff's rights to the proceeds at issue are dependent on the court's determination of Debtor's ownership of the funds; and (2) the parties agree that Plaintiff can have no greater rights in the proceeds than those rights possessed by Debtor. *See United States v. Cherry Street Partners, L.P. (In re Alliance Health of Fort Worth),* 240 B.R. 699, 704 (N.D.Tex.1999) (explaining that an assignee can have no greater right or interest than was possessed by the assignor and the filing of bankruptcy has no effect on such principle); *Defense Servs., Inc. v. United States (In re Defense Servs., Inc.),* 104 B.R. 481, 485 (Bankr.S.D.Fla. 1989) (stating that the holder of a security interest receives *"no greater right or interest than was possessed by the assignor"*) (emphasis in original).

Although Defendants acknowledge that the "[s]ums payable by former [Debtor] customers for 'network' transactions are accounts receivable," Defendants nevertheless insist that, because Debtor acted only as a "financial intermediary" for other network participants, "those accounts are not owned by [Debtor]" and, consequently, Plaintiff has no enforceable rights against the network accounts notwithstanding Plaintiff's Form UCC1. However, consistent with this court's finding *supra* that Debtor did not act as a financial intermediary and that the proceeds of the accounts receivable are owned by Debtor, the court finds Defendants' arguments contesting Plaintiff's security interest without merit.

■ First, Plaintiff's Form UCC1 covers, *inter alia,* the following collateral:

All present and future accounts, instruments (including promissory notes) and

general intangibles (including payment intangibles and any right to payment for goods sold or services rendered arising out of the sale or delivery of personal property or work done or labor performed by Debtor), now or hereafter owned by Debtor, together with any and all books of account, customer lists and other records relating in any way to the foregoing (including, without limitation, computer software, whether on tape, disk, card, strip, cartridge or any other form), and in any case where an account arises from the sale of goods, the interest of Debtor in such goods.

Second, "collateral" is defined under Louisiana law to mean "the property subject to a security interest or agricultural lien. The term includes: (A) proceeds to which a security interest attaches; (B) accounts, chattel paper, payment intangibles, and promissory notes that have been sold; and (C) goods that are the subject of a consignment." LA. REV. STAT. ANN. § 10:9–102(a)(12) (2003).

Third, under Louisiana law "account" means, *inter alia:*

> a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, . . . (vii) arising out of the use of a credit or charge card or information contained on or for use with the card. . . . The term does not include (i) rights to payment for money or funds advanced or sold, other than rights arising out of the use of a credit or charge card or information contained on or for use with the card.

*Id.* § 10:9–102(a)(2).[8]

Finally, the License Agreement specifically provides that "Customers use the Access Card as a credit card and/or debit card in the Gascard System or another acceptance system approved by [Macro]." *See* License Agreement ¶ 1.2.

Given Defendants' acknowledgment that the proceeds are accounts receivable and this court's determination that the proceeds are owned by Debtor, there can be little doubt that Plaintiff's Security Agreement, which includes all present and future accounts, granted Plaintiff a security interest in and to the proceeds of the network accounts receivable owned by Debtor.[9]

## CONCLUSION

After considering the arguments of counsel, evidence presented, and record before the court, the court finds that Plaintiff's Motion for Summary Judgment shall be, and hereby is, **GRANTED** to the following extent:

(1) Debtor owns the proceeds of the Gascard System network accounts receivable generated under Debtor's License Agreement and deposited by Macro into an interest bearing account with Plaintiff in Fort Worth, Texas; and

(2) Plaintiff holds a security interest in

---

8. The court's analysis applies Louisiana law in defining Plaintiff's rights. Though the record reflects the filing of Plaintiff's Form UCC1 in the State of Colorado, the analysis would be the same if Plaintiff's Form UCC1 were subject to Colorado, Utah, or Texas law.

9. Nor did the Louisiana court's order segregating the proceeds change the character of

the funds. The proceeds are still subject to Plaintiff's lien. Just because the funds have been held in a different account does not change Plaintiff's priority interest-a conclusion supported by counsel at the hearing who unanimously acknowledged that the funds were fairly characterized as cash collateral of the estate. *See* 11 U.S.C. §§ 363, 541 (2004).

738

said proceeds.[10]

10. The court at this time is unable to determine whether Plaintiff's security interest was properly perfected by the filing of a Form UCC1 in Colorado. The court has no knowledge of filings (if any) in other jurisdictions. However, because Macro has no claim superior to that of the estate, Macro cannot have a superior interest to Plaintiff's interest.