# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 21, 2011

No. 10-30387

Lyle W. Cayce
Clerk

In the Matter of: EVANS INDUSTRIES INCORPORATED,

Debtor

--------------------------------------------------------------------------------------------------------------

GREIF INDUSTRIAL PACKAGING AND SERVICES, LIMITED LIABILITY
CORPORATION,

Appellant

v.

R. PATRICK SHARP, III, as Distribution Trustee for the Distribution Trust
of Evans Industries, Incorporated,

Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:09-CV-3548

Before JONES, Chief Judge, and BENAVIDES, Circuit Judge, and AYCOCK,

District Judge.[*]

---

[*] District Judge of the Northern District of Mississippi, sitting by designation.

No. 10-30387

PER CURIAM:**

This dispute concerns the proper interpretation of an asset purchase agreement between a Chapter 11 debtor and the company that purchased it out of bankruptcy. We AFFIRM the judgment of the district court with respect to the holdback claims for environmental liabilities and the Ingersoll-Rand industrial equipment. We REVERSE and REMAND the judgment of the district court with respect to the Lexington insurance premium.

## BACKGROUND

Evans Industries, Inc., ("Evans") operated a series of five leased facilities in Louisiana and Texas that manufactured, filled, warehoused and distributed steel drums and industrial containers. Evans filed a Chapter 11 petition in April 2006, and the bankruptcy court confirmed the reorganization plan in October 2006. The plan formed a Distribution Trust of Evans Industries ("the Trust") and allocated most of Evans's assets to that Trust. R. Patrick Sharp, III was appointed Trustee.

In November 2006, on the plan's closing date, Greif Industrial Packaging ("Greif") entered into an asset purchase agreement ("APA") with Evans. Under the APA, Evans sold its operations at the five facilities to Greif for $11,250,000. The sale included all of Evans's property used to conduct business at all five premises, except for certain assets specifically excluded. However, $1,657,500 of that amount would be placed in a holdback escrow account funded by Greif. Greif was entitled to make holdback claims against that account for certain expenses as allowed for in the APA. Every four months, if no claims were filed,

---

** Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-30387

Greif would transfer one-fourth of the amount ($414,375) from the escrow account to the trust in accordance with the Chapter 11 plan; any disputed charges would be submitted to the bankruptcy court for resolution.

After Greif took over the facilities, it made two disputed claims against the holdback. First, it claimed $649,633.75 in expenses it incurred removing and disposing of hundreds of barrels of environmentally hazardous waste left behind by Evans at four of the five sites. Second, it claimed $10,452.06 for payments it made to a third party, Ingersoll-Rand, for five pieces of industrial equipment ("Bobcat loaders") that Evans had purchased but not yet fully paid off. Added up, the disputed holdback claims totaled $660,085.81.

The Trustee filed a complaint in bankruptcy court, asking the court to order Greif to transfer the disputed funds to the trust. The Trustee also filed a claim for the prorated portion – $97,224.12 – of an insurance premium paid by Evans as a setoff against any valid holdback claims Greif might have. Finally, the Trustee filed a claim for $5,238.09 in utilities deposits at the various sites paid by Evans but refunded to Greif. The bankruptcy court ruled for the Trustee and against Greif as to the holdback amounts and the utility deposits, but ruled for Greif as to the setoff claim for the prorated insurance premium. The parties cross-appealed as to the holdback issues and insurance premium setoff, although Greif did not appeal the $5,238.09 judgment relating to the refunded utilities deposits.

The district court affirmed as to the holdback provisions but reversed and remanded as to the insurance premium setoff, finding that the Trustee was entitled to its prorated portion of the paid premium. Greif timely appealed.

## STANDARD OF REVIEW

No.  10-30387

The dispute is over the proper interpretation of the APA, which is a contract.  *See In re Burk Dev. Co.*, 205 B.R. 778, 796 (Bankr. M.D. La. 1997); 11 U.S.C. § 1141(a).  Matters of contract interpretation are questions of law reviewed *de novo.  See In re Oxford Mgt., Inc.*, 4 F.3d 1329, 1334 (5th Cir. 1993); *In re Conte*, 206 F.3d 536, 538 (5th Cir. 2000).

## DISCUSSION

Greif challenges the district court's holding as to the environmental claims, the Bobcat loader claims, and the insurance premiums.  We address each in turn.

## I.    ENVIRONMENTAL REMEDIATION

After taking possession of the business premises and assets, Greif spent nearly $650,000 to remove and properly dispose of hundreds of barrels of hazardous waste left behind by Evans at several sites.  It is not disputed that this cleanup complied with applicable government environmental regulations.  Greif attempted unsuccessfully to claim that amount from the holdback.  Greif argues on appeal that Evans breached its warranty that the facilities complied with all relevant environmental regulations, and, in the alternative, that the bankruptcy court and district courts misread the relevant portion of the APA in which Evans retained responsibility for environmental cleanup costs that accrued prior to the APA.  We reject Greif's contentions.

Insofar as the Peters Road and Houston leases were rejected in Evans's reorganization plan, and only later, by separate agreement, were resumed by Greif, those premises were not among the assets transferred by the APA.  No liability accrues to Evans based on contamination at those sites.  As the bankruptcy court explained, the landlords of those sites might have had recourse

4

to filing a claim against Evans under the terms of the plan, but they forfeited their opportunity.  Greif has abandoned any claim as an assignee or subrogee of those landlords.

Similarly, the St. Gabriel lease was assumed by Evans and transferred under the APA, after Evans had cured any defaults under the lease by paying the landlord $300,000.  At the time Greif acquired the lease, then, it was not in default.

Greif contends, however, that its claim is payable under the APA based on (l) Evans's alleged breach of various environmental warranties concerning Evans's acknowledged storage of hazardous waste materials and (2) Evans's retention of environmental liability claims.  The critical paragraphs of the APA, § 2.3 and § 2.3.13, however, consign responsibility to Evans but do not say that Greif could engage in remediation on its own initiative and turn over the bill to the holdback fund.  We are not persuaded that the lower courts committed any reversible error in their analysis of this issue.

## II.    BOBCAT LOADER PAYMENTS

After taking control of the facilities, Greif mistakenly made payments totaling $10,452.06 to Ingersoll-Rand, for five Bobcat loaders that Evans had purchased but not yet fully paid off.  Greif had no legal duty to make the payments.  Indeed, the confirmed reorganization plan called for Ingersoll-Rand to be paid from the sale proceeds, although it apparently was not paid and came to Greif for satisfaction.

The bankruptcy court concluded that since the debt was not retained by Evans under the APA, Greif cannot claim a material breach by Evans, and therefore cannot exercise its right against the holdback.  Having reviewed the

No.  10-30387

record, the parties' briefs and oral presentations, we reach the same conclusion for essentially the same reasons.

## III.  PRORATED INSURANCE PREMIUM

The final issue is whether Evans's Lexington commercial property insurance policy covering a period both before and after the APA was among the assets transferred to Greif under the APA, or was part of a separate transaction. In the latter case, Greif would owe Evans its prorated share of the coverage: $97,224.06.  Greif concedes that it benefits from the policy which it asked Evans to transfer, but it asserts that it  paid for the policy via the APA.  Reversing the bankruptcy court, the district court found that the policy was the subject of a valid post-petition contract between Evans and Greif and ordered Greif to pay Evans $97,224.06.

The APA does not discuss this insurance policy explicitly.  Insurance appears in only two sections of the APA – Schedule A (Bill of Sale and Assignment) and Schedule G (Excluded Assets).  Both provisions discuss "[p]repaid insurance deposits, tax refunds, prepaid vendor deposits and other deposits of all other forms including utility deposits . . . ."  Greif contends the APA was all-encompassing:  Evans sold to Greif, under APA § 1.1, "any and all of its assets owned or used by [Evans] in connection with the Business, wherever located (except for the Excluded Assets), including but not limited to the following . . ."  When the APA is silent on a particular asset, according to Greif, the court should hold that the asset was transferred.

The Trustee contends that the exclusion of such a significant item as the insurance policy is a sign that the parties did not intend it to be part of the APA. The Trustee further argues that the pre-paid premium is essentially a "prepaid

No.  10-30387

insurance deposit" and is therefore an excluded asset under Schedule G.  Greif counters that pre-paid premiums are not "deposits" because the term "deposit" refers to something that might be refunded, whereas pre-paid insurance premiums are not intended to be refunded.

We find Greif's argument more persuasive.  Because the APA intended to transfer all of Evans's assets, and because it specifies that its list of assets is non-exclusive, the insurance coverage was transferred to Greif when the APA closed.  Although the policy took effect post-petition, the plan was not confirmed until five months after the policy took effect; both parties obviously were aware of its existence when the APA was consummated.  The terms in Schedule G do not exclude transfer of the insurance policy because insurance "premiums" plainly are not "deposits."  In light of the APA's all-inclusive nature, we are unwilling to contort the meaning of "deposit" to fit Evans's preferred definition.

Because the APA effectively, if silently, transferred the policy to Greif, Greif need not reimburse Evans for the prorated premium.

We reverse the judgment of the district court and remand with instructions to reject the Trustee's setoff claim of $97,224.06.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court with respect to the holdback claims for environmental liabilities and the Ingersoll-Rand industrial equipment payments, but reverse and remand with respect to proration of the Lexington insurance premium.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**