NO. 07-06-0389-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

AUGUST 20, 2008
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â ______________________________

JESSIE ALLEN WILBORN, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE
_________________________________

FROM THE 241ST DISTRICT COURT OF SMITH COUNTY;

NO. 241-0821-06; HONORABLE JACK SKEEN, JR., JUDGE
_______________________________


Before CAMPBELL and HANCOCK and PIRTLE, JJ.
MEMORANDUM OPINION
Â Â Â Â Â Â Â Â Â Â Appellant, Jessie Allen Wilborn, appeals his conviction for the offense of possession
of a controlled substance, namely cocaine, in an amount of less than one gram, enhanced
by two prior state jail felonies. The jury assessed punishment at confinement in the
Institutional Division of the Texas Department of Criminal Justice for a period of 18 years
and a $7,000.00 fine. Appellant, through three issues, contends the trial court committed
reversible error by denying a Batson challenge and that the evidence is legally and
factually insufficient. We affirm.
Background
Â Â Â Â Â Â Â Â Â Â While routinely checking license plates in a motelâs parking lot in Tyler, Texas,
Officer Larry Christian identified a van that had been reported stolen. According to the
information given the police, appellant was an employee of a company and had failed to
return the companyâs van. A representative of the company reported that appellant was
no longer authorized to be in possession of the van and requested that the van be
recovered. Christian confirmed that appellant was a registered guest at the motel and
requested additional officers for backup. Once backup had arrived, Christian contacted
appellant in his room. Appellant answered the door and acknowledged that he had not
returned the van the previous night. Christian then placed appellant in handcuffs and
arrested him for unauthorized use of a motor vehicle. Because of the presence of two
other persons, Christian swept the motel room for his safety. He found a cigarette package
in the bathroom, that upon further investigation, contained a crack pipe. Additionally,
incident to appellantâs arrest, Christian searched appellantâs backpack and found a
scouring pad which Christian believed, based on his training and experience, was an item
typically associated with illegal drug use. 
Â Â Â Â Â Â Â Â Â Â After delivering appellant to the jail, Christian proceeded to submit the cigarette
package, crack pipe, and scouring pad as evidence. While logging in the evidence,
Christian found two crack cocaine rocks within the cigarette package. Therefore, appellant
was charged with both possession of drug paraphernalia and possession of a controlled
substance. Appellant later pleaded guilty to the offense of possession of drug
paraphernalia, but pleaded not guilty to the possession of a controlled substance.
Â Â Â Â Â Â Â Â Â Â At trial, a jury convicted appellant of possession of a controlled substance, twice
enhanced, and sentenced him to 18 years confinement in the Institutional Division of the
Texas Department of Criminal Justice and a fine of $7,000. Appellant contends that the
trial court erred in denying his Batson challenge and that the evidence was legally and
factually insufficient to support his conviction.
Batson Challenge to the Stateâs Use of Peremptory Strikes
Â Â Â Â Â Â Â Â Â Â Appellant contends that, during the voir dire process, the State improperly excluded
several venire members solely on the basis of their race. Appellant objected to the Stateâs
use of peremptory strikes against African-American venire members contending that each
of the excluded venire members were qualified and that there were no justifiable reasons
for their exclusion. Hence, appellant moved for a Batson hearing arguing that the State
was unconstitutionally striking these jurors based solely on their race. At the Batson
hearing, the State provided race-neutral reasons for each of the contended strikes.
Appellant did not rebut the explanations or attempt to cross-examine the State regarding
the race-neutral explanations. The trial court found that the Stateâs reasons were race-neutral and denied appellantâs Batson challenge.
Â Â Â Â Â Â Â Â Â Â The Equal Protection Clause of the United States Constitution prohibits parties from
using peremptory strikes to exclude members of a jury panel solely on the basis of race.
See U.S. Const. amend. XIV; Tex. Code Crim. Proc. Ann. art. 35.261 (Vernon 1989)
(codifying Batson standard); Batson v. Kentucky, 476 U.S. 79, 84, 106 S.Ct. 1712, 90
L.Ed.2d 69 (1986). A Batson objection to a peremptory strike is resolved by a three-step
process. Purkett v. Elem, 514 U.S. 765, 767, 115 S. Ct. 1769, 131 L.Ed. 2d 834 (1995). 
First, âthe opponent of the . . . peremptory strike must establish a prima facie case of racial
discrimination.â Id. at 767. Second, the State, in exercising the strike, must present a
race-neutral explanation. Id. An explanation is deemed race-neutral if no discriminatory
intent is inherent in the State's explanation. Id. at 768. See also Thomas v. State, 209
S.W.3d 268, 270 (Tex.App.âHouston [1st Dist.] 2006, no pet.). Third, if the State provides
a race-neutral explanation for the challenged strikes, the opponent of the peremptory
strikes must carry the burden of persuasion to show the explanation is only a pretext for
race-motivated strikes. See Camacho v. State, 864 S.W.2d 524, 529 (Tex.Crim.App.
1993). 
Â Â Â Â Â Â Â Â Â Â Appellant failed to challenge the Stateâs race-neutral explanations by not cross-examining the State or offering any evidence following the Stateâs race-neutral
explanations for the peremptory strikes. See Herron v. State, 86 S.W.3d 621, 630
(Tex.Crim.App. 2002); Camacho, 864 S.W.2d at 529. Therefore, we conclude that the trial
court did not err in overruling appellantâs Batson challenge to the Stateâs use of peremptory
strikes. Appellantâs first issue is overruled.
Legal and Factual Sufficiency of the Evidence
Â Â Â Â Â Â Â Â Â Â In assessing the legal sufficiency of the evidence, we review all the evidence in the
light most favorable to the verdict to determine whether any rational trier of fact could have
found the essential elements of the offense beyond a reasonable doubt. Jackson v.
Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Ross v. State, 133
S.W.3d 618, 620 (Tex.Crim.App. 2004). In conducting a legal sufficiency review, an
appellate court may not sit as a thirteenth juror, but rather must uphold the juryâs verdict
unless it is irrational or unsupported by more than a mere modicum of evidence. Moreno
v. State, 755 S.W.2d 866, 867 (Tex.Crim.App. 1988). 
Â Â Â Â Â Â Â Â Â Â When an appellant challenges the factual sufficiency of the evidence supporting his
conviction, the reviewing court must determine whether, considering all the evidence in a
neutral light, the jury was rationally justified in finding the appellant guilty beyond a
reasonable doubt. See Watson v. State, 204 S.W.3d 404, 415 (Tex.Crim.App. 2006). In
performing a factual sufficiency review, we must give deference to the fact finderâs
determinations if supported by evidence and may not order a new trial simply because we
may disagree with the verdict. See id. at 414. As an appellate court, we are not justified
in ordering a new trial unless there is some objective basis in the record demonstrating that
the great weight and preponderance of the evidence contradicts the juryâs verdict. See id.
at 417. Additionally, an appellate opinion addressing factual sufficiency must include a
discussion of the most important evidence that appellant claims undermines the juryâs
verdict. Sims v. State, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003).
Â Â Â Â Â Â Â Â Â Â To prove possession of a controlled substance, the State is required to prove the
accused (1) exercised actual care, custody, control, or management over the substance
and (2) knew the matter he possessed was contraband. See Poindexter v. State, 153
S.W.3d 402, 405 (Tex.Crim.App. 2005); Tex. Health & Safety Code Ann. Â§ 481.002 (38)
(Vernon 2003). The evidence must establish the accusedâs connection with the controlled
substance was more than just fortuitous. Brown v. State, 911 S.W.2d 744, 747
(Tex.Crim.App. 1995).
Â Â Â Â Â Â Courts have found numerous factors useful in determining whether an accused's
link to a controlled substance was more than just fortuitous. Affirmative links may include,
but are not limited to: (1) appellant's presence when the contraband was found; (2) whether
the contraband was in plain view; (3) appellant's proximity to and accessibility of the
contraband; (4) whether appellant was under the influence of narcotics when arrested; (5)
whether appellant possessed other contraband when arrested; (6) whether appellant made
incriminating statements when arrested; (7) whether appellant attempted to flee; (8)
whether appellant made furtive gestures; (9) whether there was an odor of the contraband
present; (10) whether appellant owned or had the right to possess the place where the
drugs were found; (11) whether the place the drugs were found was enclosed; (12) the
amount of contraband found; (13) whether appellant possessed weapons; and (14)
whether appellant possessed a large amount of cash. See Taylor v. State, 106 S.W.3d
827, 831 (Tex.App.âDallas 2003, no pet.). It is not the number of factors present that is
important but the logical force of these factors which determines whether the State's
evidence links appellant to the contraband. See Gilbert v. State, 874 S.W.2d 290, 298
(Tex.App.âHouston [1st Dist.] 1994, pet. ref'd).
Â Â Â Â Â Â Â Â Â Â Appellant asserts that the bathroom was accessible to the two other persons found
in the motel room and that he was not in exclusive possession of the contraband. Thus,
the State was required to present evidence, direct or circumstantial, linking appellant to the
contraband to establish appellant was guilty of possession. While many of the factors
neither support nor dispute the conclusion that appellant had possession of the controlled
substance, several factors weigh against appellant. The motel room where the cocaine
was found was rented to appellant. Additionally, appellant pleaded guilty to possession of
the crack pipe found in the same cigarette package containing the cocaine thereby
connecting appellant to the cocaine. Finally, appellantâs backpack contained additional
paraphernalia, the scouring pad, that also linked appellant to the cocaine. When all this
evidence is viewed in the light most favorable to the verdict, as we must in a legal
sufficiency review, we cannot say the jury acted irrationally when it found the evidence
sufficient to convict beyond a reasonable doubt. Jackson, 443 U.S. at 319; Ross, 133
S.W.3d at 620. Furthermore, turning to factual sufficiency, even when the evidence is
viewed in a neutral light, we conclude that the jury was rationally justified in finding
appellant guilty beyond a reasonable doubt. Watson, 204 S.W.3d at 415. Appellantâs
main argument is that there were others present in the motel room and that they also had
access to the bathroom where the cocaine was found. While this assertion may be true,
it only shows that appellant was not in exclusive control of the contraband. Exclusive
control is not a required element of a possession charge. See Martin v. State, 753 S.W.2d
384, 386 (Tex.Crim.App. 1988). The presence of others in the motel room does not
eliminate the juryâs rational belief that, in light of all the evidence, appellant exercised actual
care, custody, control, or management over the substance and knew the matter he
possessed was contraband. Accordingly, appellant's contention regarding the insufficiency
of the evidence is overruled. We overrule appellantâs second issue.
Â 
Conclusion
Â Â Â Â Â Â Â Â Â Â Having overruled both of appellantâs issues, the judgment of the trial court is
affirmed.Â 
Â 
Â 
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Mackey K. Hancock

 Justice







Do not publish. 








arriage from his father and funds he received under an
earnout agreementÂ on the sale of the family business.Â  Finding the trial court did not abuse its
discretion in its characterization of the property in question, we will affirm.

Â 

Â 

Background

Â Â Â Â Â Â Â Â Â Â Â  BillyÂs
father, William Herbert Watson, Sr. (W.H.) founded Watson Institutional Foods,
Inc. (ÂWatson FoodsÂ) in 1955 and was CEO.Â 
Mike Davis and later Billy worked for Watson Foods while attending
college and after graduation became full-time employees. Each rose in
responsibility.Â  Davis ultimately became
president and chief operating officer.Â 
Billy became executive vice president of sales and marketing.Â  

Â Â Â Â Â Â Â Â Â Â Â  In
1985, W.H. began to transfer shares of stock in the corporation to Billy and
Davis.Â  From 1985 through 1999, W.H.
annually transferred equal amounts of his Class A, or voting, shares of the
corporation to Billy and Davis.Â  Through
these transfers, each eventually obtained 12.25 percent Class A share
ownership.[1]Â  According to W.H.Âs trial testimony, the
stock transfers to Davis and the Watson children were gifts made according to
an estate plan. 

Â Â Â Â Â Â Â Â Â Â Â  During
the tenure of Billy and Davis, Watson Foods grew significantly.Â  Davis testified it more than doubled.Â  Billy and Davis handled the day-to-day operations
but W.H. retained controlling share ownership and an active presence in the
business.Â  By the 1990s, other entities
expressed interest in purchasing the corporation.Â  In early 2000, a deal was struck whereby
Watson Foods merged with Sysco Food Services of Texas, Inc. (Sysco Texas) a
wholly-owned subsidiary of Sysco Corporation.Â 
Sysco Texas was the surviving corporation of the merger.

Â Â Â Â Â Â Â Â Â Â Â  According
to Davis, the consideration Sysco paid for the merger was allocated among an
exchange of stock, replacement of the corporationÂs employee stock ownership
plan with a Sysco 401(k) plan, a noncompetition agreement paying cash to Billy,
Davis, and W.H., and an earnout agreement.Â 
Entitlement to payment under the earnout agreement required that Sysco
Texas achieve agreed Âperformance goalsÂ over the three years following the
merger. 

Â Â Â Â Â Â Â Â Â Â Â  Billy
and Nina married in June 1995 and in February 2006 Billy filed for
divorce.Â  Nina counterclaimed seeking a
disproportionate division of the community estate.Â  The major issues for trial were property
characterization and division.Â  Following
a bench trial, the court granted the divorce and divided the marital
estate.Â  On the request of Nina, it made
findings of fact and conclusions of law.Â 
Among other things, it classified as BillyÂs separate property the Sysco
stock derived from the Watson Foods shares he received from W.H., before and
during marriage, and the principal balance of funds paid Billy under the
earnout agreement with Sysco. 

Analysis 

Â Â Â Â Â Â Â Â Â Â Â  Through
her first two issues Nina contends the trial court mischaracterized as BillyÂs
separate property the Watson Foods stock he acquired from his father and the
proceeds paid under the earnout agreement. 

Â Â Â Â Â Â Â Â Â Â Â  To
determine whether the trial court erred in characterizing property, we apply an
abuse of discretion standard.Â  See
Boyd v. Boyd, 131 S.W.3d
605, 617 (Tex.App.ÂFort Worth 2004, no pet.).Â 
A trial court abuses its discretion when it acts without reference to
any guiding rules or principles or, said differently, the act under review was
arbitrary and unreasonable.Â  Downer v.
Aquamarine Operators, Inc., 701
S.W.2d 238, 241-42 (Tex. 1985).Â  Under
the abuse of discretion standard, applied in a family law case, legal and
factual sufficiency of the evidence are not independent grounds of error, but
are relevant factors for determining whether the trial court abused its
discretion. Â Boyd, 131 S.W.3d at 611; Moroch
v. Collins, 174 S.W.3d 849,
857 (Tex.App.ÂDallas 2005, pet. denied).Â 
See Beaumont Bank, N.A. v. Buller, 806 S.W.2d 223, 226 (Tex. 1991) (turnover order).Â  Only if the trial courtÂs mischaracterization
is of such proportion that it affects the just and right division of the
community estate must we remand the entire case for a just and right division
based on the correct characterization of the property.Â  Boyd, 131 S.W.3d at 618.

Â Â Â Â Â Â Â Â Â Â Â  Community
property is property, other than separate property, acquired by either spouse
during marriage.Â  See Tex. Fam.
Code Ann. Â§ 3.002 (Vernon 2006).Â 
Separate property is property owned by a spouse before marriage,
acquired during marriage by gift, devise, or descent, or acquired as a recovery
for personal injuries sustained during the marriage.Â  See Tex. Fam. Code Ann. Â§ 3.001 (Vernon 2006).Â  Property possessed by either spouse during or
on dissolution of marriage is presumed community property.Â  Tex. Fam. Code Ann. Â§ 3.003(a) (Vernon 2006);
Roach v. Roach, 672
S.W.2d 524, 529 (Tex.App.ÂAmarillo 1984, no writ).Â  To overcome the presumption of community
property, the contesting spouse must prove by clear and convincing evidence
that the property is separate.Â  Tex. Fam.
Code Ann. Â§ 3.003(b) (Vernon 2006).Â 
ÂClear and convincing evidenceÂ is that measure or degree of proof that
will produce in the mind of the trier of fact a firm belief or conviction as to
the truth of the allegations sought to be established.Â  In re J.F.C., 96 S.W.3d 256, 264 (Tex. 2002).

Â Â Â Â Â Â Â Â Â Â Â  A
gift is a voluntary transfer of property to another made gratuitously and
without consideration.Â  Hilley v.
Hilley, 161 Tex. 569, 342
S.W.2d 565, 569 (1961).Â  The elements of
a gift are: (1) the intent to make a gift; (2) delivery of the property; and
(3) acceptance of the property.Â  Panhandle
Baptist Found., Inc. v. Clodfelter,
54 S.W.3d 66, 72 (Tex.App.ÂAmarillo 2001, no pet.). 

Â Â Â Â Â Â Â Â Â Â Â  In
reviewing the legal sufficiency of the evidence under a clear and convincing
standard, we look at all the evidence, in the light most favorable to the
judgment, to determine if the trier of fact could reasonably have formed a firm
belief or conviction that its finding was true.Â 
In re J.F.C., 96
S.W.3d at 265-66.Â  We presume that the
trier of fact resolved disputed facts in favor of its findings if a reasonable
trier of fact could do so.Â  Id.Â  We
disregard any contrary evidence if a reasonable trier of fact could do so, but
we do not disregard undisputed facts.Â  In
the Interest of J.L., 163
S.W.3d 79, 85 (Tex. 2005).

Â Â Â Â Â Â Â Â Â Â Â  In
conducting a factual sufficiency review under the clear and convincing
standard, we must consider all the evidence the fact finder could reasonably
have found to be clear and convincing, determining whether, on the entire
record, the fact finder could reasonably have formed a firm belief or
conviction of the truth of the allegations.Â 
See In re J.F.C., 96
S.W.3d at 266; In the Interest of C.H., 89 S.W.3d 17, 25, 27-29 (Tex. 2002).Â  In so doing, we consider whether disputed
evidence is such that a reasonable fact finder could have resolved it in favor
of its finding.Â  If, in light of the
entire record, disputed evidence that a reasonable fact finder could not have
resolved in favor of the finding is so significant as to prevent a fact finder
reasonably from forming a firm belief or conviction of the truth of the
finding, then the evidence is factually insufficient.Â  See In re J.F.C., 96 S.W.3d at 266; In re S.M.L.D., 150 S.W.3d 754, 757 (Tex.App.ÂAmarillo 2004, no pet.).

The Stock

Â Â Â Â Â Â Â Â Â Â Â  We
turn first to the characterization of the Watson Foods stock that Billy
received from W.H.Â  The evidence included
transfer documents which, according to testimony, reflected the 1995 through
1999 transfers of Watson Foods stock from W.H. to Billy, during BillyÂs marriage
to Nina and prior to the merger.Â  Except
for their dates and the details of the shares transferred, the transfer
documents are identical in form.Â  The
document is entitled, ÂAct of Donation Inter Vivos.ÂÂ  A sub-heading follows, stating, ÂAct of Donation
Inter Vivos By William H. Watson To William H. Watson, Jr.ÂÂ  In part, material to our discussion, the
document continues:

WILLIAM H. WATSON, of full legal age and resident of
LUBBOCK, State of TEXAS who declared under oath to me, Notary, that in consideration
of the relationship and services provided, do by these presents grant, bargain,
donate, convey, transfer, assign, set over, abandon and deliver, . . . unto the
said WILLIAM H. WATSON, JR., of full legal age and resident of LUBBOCK, State
of TEXAS, here present and accepts such donation with gratitude as his/her
separate property and estate for himself, his heirs and assigns, and
acknowledging due delivery and possession thereof, all and singular the
following property to-wit:

Â 

An entire interest in the following described property:

Â 

[here appears the number, class, and value of shares
transferred] as of the date of this gift, as determined by an independent
appraiser. 

***

TO HAVE AND TO HOLD the above-described property unto the
said donee . . . forever.

Â 

THUS DONE AND PASSED, in my presence, WILLIAM H. WATSON,
Donor and WILLIAM H. WATSON, JR., Donee [date], in the presence of . . .,
competent witnesses, who hereunder sign their names with the said appearers and
me, Notary, after reading of the whole.

Â 

Each transfer document is signed by
W.H., Billy, two witnesses and the notary public.

Â Â Â Â Â Â Â Â Â Â Â  Simply
said, Nina contends the transfer documentÂs inclusion of the phrase Âin
consideration of the relationship and services providedÂ provides conclusive
evidence the shares were transferred in consideration of BillyÂs services
during the marriage, requiring their characterization as community
property.Â  Billy counters that the
language of the transfer document evidences a gratuitous transfer rendering the
shares his separate property.Â  Neither
party claims ambiguity in the transfer document.Â  Thus, its construction is a matter of law
that we review de novo.Â  See
Borders v. KRLB, Inc., 727
S.W.2d 357, 359 (Tex.App.ÂAmarillo 1987, writ refÂd n.r.e.).Â  As such, we need not defer to any
interpretation afforded the document by the trial court.Â  Cross Timbers Oil Co. v. Exxon Corp., 22 S.W.3d 24, 26
(Tex.App.ÂAmarillo 2000, no pet.).Â  We
strive to give effect to the intent of the parties as taken from the language
of the instrument, and we consider the language in its entirety.Â  Id.Â 
Specifically, we peruse the entire document to understand, harmonize,
and effectuate all of its provisions.Â  Id.; State Farm Life Ins. Co. v.
Beaston, 907 S.W.2d 430,
433 (Tex. 1995) (contract is read as a whole, rather than by isolating a
certain phrase, sentence, or section). 

Â Â Â Â Â Â Â Â Â Â Â  We
cannot agree the phrase Âin consideration of the relationship and services
provided,Â in the transfer document has the effect Nina posits.Â  Excepting only the two words Âservices
provided,Â the transfer document in all respects speaks of a gift
transfer.Â  Its title and sub-heading
refer to a donation; its parties are referred to as donor and donee; by its
acceptance language the donee Âaccepts such donation with gratitude as his/her
separate property and estate.ÂÂ  The four
corners of the instrument give no hint of the nature of the Âservices
provided.Â[2]Â  NinaÂs argument assumes the phrase can mean
only a valuable consideration, and her assumption likely would be accurate in
most instances.Â  But, like the
ÂrelationshipÂ recited as constituting part of the consideration for these
share transfers, consideration recited in a document of transfer may refer to a
non-valuable consideration that is not inconsistent with a gift.Â  See, e.g., Babb v. McGee, 507 S.W.2d 821, 823
(Tex.Civ.App.ÂDallas 1974, writ refÂd n.r.e.) (recitation in deed of $10.00 and
love and affections held to constitute a gift); cf. Glenney v. Crain, 352 S.W.2d 773, 775
(Tex.Civ.App.ÂHouston 1961, writ refÂd n.r.e.) (love and affection is not a
consideration deemed valuable in law).Â 
Attempting to reconcile and harmonize all of the language employed in
the transfer document, we seek guidance in a phrase recently employed by the
Texas Supreme Court, noscitur a sociis (Âa word is known by the company
it keepsÂ). United States Fid. & Guar. Co. v. Goudeau, 272 S.W.3d 603, 606 (Tex. 2008)
(construing insurance policy).Â  By this
canon of construction, the meaning of a particular word or phrase is
ascertained by reference to those words or phrases with which it is associated.Â  See Green Ave. Apartments Inc., v.
Chambers, 239 S.W.2d 675,
684-85 (Tex.Civ.App.ÂBeaumont 1951, no writ) (quoting Williston on
Contracts (revÂd ed.)).Â  Here, in the
context of these documents reflecting transfers from father to son, the
Âservices providedÂ phrase is associated with the ÂrelationshipÂ between the
donor and donee.Â  Accordingly, we find
the phrase Âin consideration of the relationship and services providedÂ here
refers not to some unspecified but valuable consideration but to those arising
from the familial relationship.Â  See Stewart v. Damron, 63 Ariz. 158,
167, 160 P.2d 321, 325 (1945) (equating love and affection consideration for
gift with Âservices such as association, care, mutual assistance,
companionship, understanding, and supportÂ).Â 
The phrase does not conclusively demonstrate that W.H. transferred the
Watson Foods shares to his son Billy for a valuable consideration inconsistent
with a gift. 

Â Â Â Â Â Â Â Â Â Â Â  Nina
next argues that the trial court abused its discretion in characterizing the
stock as the separate property of Billy because the finding is not supported by
factually sufficient evidence.Â  

Â Â Â Â Â Â Â Â Â Â Â  The
essence of NinaÂs factual insufficiency claim is Billy was undercompensated and
received the Watson Foods stock from his father as additional consideration for
his services as an officer of Watson Foods.Â 
To support this argument, Nina relies on the Âservices providedÂ
language of the transfer document.Â  She
also points to facts surrounding the relationship among Billy, his father,
Davis, and Watson Foods.Â  Davis is not
related to W.H. or Billy.Â  Yet W.H.
transferred an identical number of Class A shares to Billy and Davis each year
they served as officers for Watson Foods.Â 
DavisÂs testimony indicated the corporationÂs performance each year had
an impact on the determination of the number of shares W.H. transferred to him
and Billy the following year.Â  W.H.,
Billy, and Davis were the only holders of Class A shares at the time of the
merger.Â  At that time, the Class A stock
in Watson Foods was valued at $9,000,000.Â 
Watson Foods stock was annually appraised for the corporationÂs employee
stock ownership plan.Â  On four occasions
during 1995 through 1997, the value of shares transferred to Billy was
discounted from the appraised value.[3] 

Â Â Â Â Â Â Â Â Â Â Â  To
support the theory of undercompensation, Nina presented at trial a CPA with
certification as a valuation analyst.Â  In
his opinion, Watson Foods undercompensated Billy a total of $271,000 for 1996
through 1999.Â  This conclusion drew his
attention to the transfer documents where he noted the phrase Âservices
provided.ÂÂ  He then formed an
ÂimpressionÂ of a compensatory element in the transfer documents.Â  In his opinion, Âperhaps the after-marriage
transfers would constitute services and assets, compensation.Â As a basis for
his opinion concerning the appropriate level of compensation for Billy from
Watson Foods, the CPA relied on data he obtained from a website, Âsalary.com.Â
When asked if this website was generally accepted in the profession, he
responded that he knew of its use by a number of certified valuation analysts. 

Â Â Â Â Â Â Â Â Â Â Â  The
CPA was subject to a lengthy cross-examination.Â 
He explained that he did not consider other salary-reporting websites in
making his undercompensation determination.Â 
The information obtained from salary.com was particular to a vice
president of sales position but was not specifically tailored to Billy.Â  The CPA was not familiar with BillyÂs job
description.Â  But he believed the job
description for a vice president of sales obtained from salary.com was
appropriate Âbased on what little [he] knewÂ about BillyÂs work.Â  In making his evaluation, the CPA did not
inquire of Watson Foods or Sysco Texas of BillyÂs job responsibilities.Â  He could not say if salary.com included
information about the food service industry in west Texas and agreed the
information on which he relied was from unknown industries.Â  The CPA was not aware of positions in Lubbock
comparable to BillyÂs nor did he know how BillyÂs salary was calculated.Â  In his opinion, establishing a rate of
compensation is an internal matter subject to outside influences such as
competition.Â  He believed profitability
of the company could also impact salary.Â 
Except for his belief that Billy was undercompensated, the CPA agreed
that gifting of stock by W.H., with corresponding reporting on gift tax
returns, was a ÂtypicalÂ approach in estate planning.Â  

Â Â Â Â Â Â Â Â Â Â Â  The
evidence showed W.H. began transferring Watson Foods stock to Billy and Davis
in 1985.Â  W.H. testified that he
initiated the program of stock transfers on advice of tax professionals for the
purpose of estate planning.Â  He received
nothing of monetary value from Billy in return for the stock and added that it
was not expected.Â  He believed the
transfer documents were prepared by his accountant.Â  Gift tax returns filed by W.H. were admitted
at trial.Â  These reported gifts of Watson
Foods stock to Billy and Davis as well as gifts of units in another entity,
Watson Development, Ltd., to W.H.Âs other two children.Â  The record contains no evidence that Billy
rendered toil or labor for his father in consideration for valuable
compensation.Â  On cross-examination, W.H.
agreed that he set the salaries of Billy and Davis for Watson Foods. 

Â Â Â Â Â Â Â Â Â Â Â  Davis
testified that during the 1980s, W.H. appointed him president of Watson Foods
and Billy vice president.Â  W.H. also
began gifting Watson Foods stock to Davis and Billy.Â  According to Davis, no consideration for the
stock passed from Davis and Billy to W.H.Â 
At the time of the merger, Billy and Davis each possessed approximately
12.25 percent of Watson Foods Class A stock.Â 
On cross-examination, Davis agreed that his money and that of Billy was
Âtied upÂ in the corporation.Â  

Â Â Â Â Â Â Â Â Â Â Â  Nina
testified that before marriage Billy told her nothing about his shares of
Watson Foods.Â  And during marriage he
stated that his pay was not adequate.Â 
Billy testified that in a premarital conversation he told Nina of the
Watson Foods stock and its status as a gift from his father.Â  

Â Â Â Â Â Â Â Â Â Â Â  As
trier of fact the court was the exclusive judge of the credibility of the
witnesses and the weight to be given their testimony.Â  City of Keller v. Wilson, 168 S.W.3d 802, 819 (Tex.
2005).Â  Giving due consideration to the
evidence that the trial court could reasonably have found to be clear and
convincing, we find the evidence was both legally and factually sufficient to
support the trial courtÂs finding that the stock was the separate property of
Billy.Â  Accordingly, we overrule NinaÂs
first issue.

The Earnout

Â Â Â Â Â Â Â Â Â Â Â  In
her second issue, Nina argues the trial court abused its discretion by
classifying proceeds received by Billy from Sysco Texas under the earnout
agreement as BillyÂs separate property.Â 
Nina advances her argument through three grounds.Â  Her first contention depends, however, on the
presupposition that the trial court abused its discretion by characterizing the
Watson Foods stock as BillyÂs separate property.Â  Because we have found the trial court did not
mischaracterize the stock, and did not, accordingly, abuse its discretion, we
focus on NinaÂs remaining two grounds.Â 
These issue from the contention that the earnout proceeds were dependent
on the profitability of Sysco Texas, a company in which Billy was an executive
officer responsible for sales.Â  Nina
contends the earnout proceeds were income to the community because they were
either compensation for BillyÂs labor or income from his separate
property.Â  

Â Â Â Â Â Â Â Â Â Â Â  The parties do not present disputed
material issues of fact pertaining to characterization of the earnout
proceeds.Â  Rather, our task again
involves examination of documents neither party claims are ambiguous.Â  In the sale of a business employing an
earnout agreement as part of the purchase consideration, the buyer pays an
agreed Âup-frontÂ portion of the purchase price with the final amount
determined by the future profits of the business.Â  Ordinarily the seller participates in
management of the business for a time following closure of the sale.Â  In re A.P.F. Co., 270 B.R. 567, 572 n.8 (Bankr. D. Del. 2001). 

Â Â Â Â Â Â Â Â Â Â Â  The
merger agreement provides the shareholders of Watson Foods would receive, as
consideration for their shares, $9,060,066 plus ÂEarnout Cash.ÂÂ  In this respect, the agreement further
provides the Watson shareholders Âshall have the right to earn up to $4 million
in cash (ÂEarnout CashÂ) over a three-year period based upon achievement of
operating results of Surviving Corporation [Sysco Texas] during such three-year
period.ÂÂ  The particular conditions for
obtaining the earnout cash are specified by a contemporaneously executed
ÂEarnout Agreement.ÂÂ  The parties to the
earnout agreement are Sysco, Sysco Texas, W.H., Billy, and Davis.Â  It identifies the three individuals as ÂEarnout
Shareholders.ÂÂ  The earnout shareholders
are paid according to their percentage of Class A share ownership in Watson
Foods.Â  Under the agreement Billy was
paid $500,000 of which $353,907.03 remained in an account at the time of the
divorce proceeding.Â  We find these
contractual provisions consistent with an agreement conditioning the final
payment of consideration for the sale of a business on the future performance
of the business.Â  Such language is not,
on the other hand, consistent with an employee bonus arrangement.

Â Â Â Â Â Â Â Â Â Â Â  The
targeted pre-tax earning goals for Sysco Texas were a flat, unchanging
percentage for each of the three years.Â 
This is consistent with an agreement making payment of the final
purchase price of a business contingent on maintaining agreed, targeted
earnings following the sale.Â  See
A.P.F., 270 B.R. at 572.Â  Conversely, it is not consistent with an
incentive earning agreement that rewards employees for achieving an agreed
performance level or profit amount.Â  Id.Â 


Â Â Â Â Â Â Â Â Â Â Â  The
merger agreement provides a conditional offer of employment to Watson Foods
employees on Âsubstantially the same terms and conditionsÂ as afforded by
Watson Foods.Â  Notably, the merger
agreement and earnout agreement do not treat earnout cash as additional
compensation for W.H., Billy, and Davis.Â 
See A.P.F., 270
B.R. at 573.Â  Indeed, the agreements do
not require continued employment of the shareholders as a condition to the
payment of the earnout agreement.

Â Â Â Â Â Â Â Â Â Â Â  The
parties do not point us to, nor do we find, any record fact or legal authority
leading to a conclusion other than the earnout cash was the final payment of
consideration for the surrender by W.H., Billy, and Davis of their shares of
stock in Watson Foods.Â  We accordingly
find the trial court did not abuse its discretion by characterizing the earnout
cash received by Billy as his separate property.Â  NinaÂs second issue is overruled. 

Â Â Â Â Â Â Â Â Â Â Â  By
her final issue, Nina seeks remand for a just and right division of the
community estate, based on findings by this court that the trial court abused
its discretion in characterizing the Watson Foods stock and earnout cash as
BillyÂs separate property.Â  Because we
have found no error by the trial court, discussion of NinaÂs third issue is
unnecessary to our disposition of the appeal.Â 
Tex. R. App. P. 47.1. 

Conclusion

Â Â Â Â Â Â Â Â Â Â Â  Having
overruled NinaÂs issues necessary to the disposition of the appeal, we affirm
the judgment of the trial court.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  James
T. Campbell

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Justice

Â Â Â Â Â Â Â Â Â Â Â  

Â 

Â 











Â 

[1] W.H.Âs other two children, who were not
employees of Watson Foods, received Class C shares.





Â 

[2]
Nor does the record contain evidence Billy rendered services for his father in
exchange for the shares.





Â 

[3]
Correspondence contained in the record from BillyÂs accountant mentions, in
general terms, discounting based on a lack of marketability and minority
shareholder status.